2011 UT App 423

**McNEIL ENGINEERING AND LAND SURVEYING, LLC; McNeil Engineering, Inc.; and Scott McNeil, Plaintiffs, Counterclaim Defendants, and Appellant,**

v.

**Dale K. BENNETT; Benchmark Engineering and Land Surveying, LLC; Benchmark Cad Services, LLC; Land Development Cadd, Inc.; and Florence B. Alhambra, Defendants, Counterclaimants, and Appellee.**

No. 20100862–CA.

Court of Appeals of Utah.

Dec. 15, 2011.

Matthew C. Barneck and Paul P. Burghardt, Salt Lake City, for Appellant.

Reed L. Martineau, Keith A. Call, and Derek J. Williams, Salt Lake City, for Appellee.

Before Judges McHUGH, ORME, and THORNE.

## OPINION

McHUGH, Associate Presiding Judge:

¶ 1 McNeil Engineering and Land Surveying, LLC (ME & LS) appeals the trial court's judgment in favor of Dale K. Bennett. We reverse and remand for further proceedings consistent with this opinion.

## BACKGROUND

¶ 2 Scott F. McNeil founded McNeil Engineering, Inc. (MEI) in 1983, and he continues to be its sole owner. MEI hired Bennett in 1983. In 1996, McNeil restructured his busi-

ness by dividing the operations of MEI among three newly-created limited liability companies, including ME & LS. Since then, MEI has acted as a "sort of umbrella company" that does not perform engineering services. MEI now provides administrative support and leases its employees to ME & LS and McNeil's other limited liability companies. As a result of this arrangement, ME & LS does not have any traditional employees; instead, it leases all of its employees from MEI. The leased employees receive their salaries, bonuses, and benefits from MEI but perform their work assignments exclusively for ME & LS or one of the other limited liability companies formed by McNeil.

¶ 3 In December 1996, McNeil, Bennett, and five others entered into an operating agreement (Operating Agreement) for the newly-formed ME & LS. Bennett, McNeil, and each of the others were designated as members of ME & LS, and Bennett and McNeil were named the initial managing members. Approximately five years later, on November 1, 2001, the ME & LS members amended the Operating Agreement (Second Amendment),[1] in order to expand and clarify the provisions governing a member's withdrawal from the company. Section 12.1 of the Second Amendment states that one way in which "[a] Person shall cease to be a Member" of ME & LS is if the person withdraws from the company. Section 12.3(a) of the Second Amendment then explains, "For purposes of this Section, a Member shall be deemed to withdraw when the Member voluntarily resigns or terminates the Member's employment with the Company for reasons other than bankruptcy, death, disability or incompetency." Although the term "employment" is not defined, Section 1.10 of the Operating Agreement defines "Company" as ME & LS. Section 12.3 of the Second Amendment further provides that "the Company and each other Member shall have an option to purchase the withdrawing Member's Membership Interest" and that "[t]he purchase price shall be an amount equal to the book value of the Member's Membership Interest in the Company."

¶ 4 On August 17, 2005, Bennett submitted a letter of resignation to McNeil, announcing his resignation from MEI. As a result, MEI could no longer lease Bennett's services to ME & LS, and Bennett did not perform any work for ME & LS after the date of his resignation letter. At that time, Bennett owned 252 shares of ME & LS, which was equivalent to a 26.53% membership interest. In addition to tendering his resignation, Bennett's letter indicated that he wished to receive "at least current book value" for his shares in ME & LS.

¶ 5 In a June 29, 2006 letter, ME & LS exercised its option to purchase Bennett's membership interest at "book value" to be determined as of a certain date. On August 1, 2006, Bennett rejected the offer and asserted that his resignation from MEI did not constitute withdrawal as a member of ME & LS. This litigation ensued.

¶ 6 After the completion of significant discovery, the parties filed cross-motions for partial summary judgment on whether Bennett's resignation from MEI constituted a withdrawal from his membership in ME & LS. On December 21, 2006, the trial court found in favor of Bennett, stating that

the term "employment" as it is used in Section 12.3 of the Operating Agreement is not ambiguous, and that the natural use and meaning of that term as it is used within Section 12.3 is that in order to withdraw as a member, the member must voluntarily resign employment from ME & LS.

The Court also conclude[d] that the parties intended the term "employment" to refer only to employment specifically with ME & LS, and that the parties did not intend the term to be broad enough to include employees leased from other businesses.

On April 3, 2008, the trial court entered, through a different judge, judgment in favor of Bennett and ordered ME & LS to pay $142,174.93, which is the amount to which Bennett would have been entitled in the form of member distributions for 2005 and 2006.

---

1. The first formal amendment to the Operating Agreement occurred on August 1, 2000; however, the terms of that amendment are not at issue in this appeal.

McNeil filed an appeal, but this court dismissed the appeal for lack of proper certification on May 21, 2009. *See McNeil Eng'g & Land Surveying v. Bennett*, 2009 UT App 138U, para. 5, 2009 WL 1423554 (mem.). On October 17, 2010, a third trial court judge issued an amended order to certify the April 3, 2008 order as final. *See generally* Utah R. Civ. P. 54(b). ME & LS now appeals the trial court's partial summary judgment and the underlying orders from December 21, 2006, and April 3, 2008.[2]

## ISSUE AND STANDARDS OF REVIEW

¶ 7 ME & LS claims that the trial court erred by narrowly interpreting "employment" in the Second Amendment to exclude the work of leased employees.[3] "The interpretation of a contract is a question of law, which we review for correctness, giving no deference to the ruling of the [trial] court." *Salt Lake City Corp. v. Big Ditch Irrigation Co.*, 2011 UT 33, ¶ 19, 258 P.3d 539. Likewise, the determination of whether a contract is facially ambiguous is a question of law, which we review for correctness. *See Daines v. Vincent*, 2008 UT 51, ¶ 25, 190 P.3d 1269. We resolve questions of facial ambiguity in a contract according to the parties' intent, which is a question of fact. *See id.*

## ANALYSIS

¶ 8 "Under well-accepted rules of contract interpretation, we look to the language of the contract to determine its meaning and the intent of the contracting parties." *Café Rio, Inc. v. Larkin–Gifford–Overton, LLC*, 2009 UT 27, ¶ 25, 207 P.3d 1235. We also "consider each contract provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none." *Green River Canal Co. v. Thayn*, 2003 UT 50, ¶ 17, 84 P.3d 1134 (omission in original) (internal quotation marks omitted).

"If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Id.* (internal quotation marks omitted). "A contractual term or provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Daines*, 2008 UT 51, ¶ 25, 190 P.3d 1269 (internal quotation marks omitted). In determining whether a contract is ambiguous, we "consider any credible evidence" but will not conclude that the contract is ambiguous unless both interpretations "are reasonably supported by the language of the contract." *See Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 268 (Utah 1995); *see also Daines*, 2008 UT 51, ¶ 27, 190 P.3d 1269.

¶ 9 "[C]ontractual ambiguity can occur in two different contexts: (1) facial ambiguity with regard to the language of the contract and (2) ambiguity with regard to the intent of the contracting parties." *Daines*, 2008 UT 51, ¶ 25, 190 P.3d 1269. To determine if a contract is facially ambiguous, "a judge [must] first review relevant and credible extrinsic evidence offered to demonstrate that there is in fact an ambiguity." *Id.* ¶ 31. However, "a finding of ambiguity [is justified] only if the competing interpretations are 'reasonably supported by the language of the contract.'" *Id.* (quoting *Ward*, 907 P.2d at 268); *see also Moss v. Parr Waddoups Brown Gee & Loveless*, 2008 UT App 405, ¶ 12, 197 P.3d 659.

¶ 10 Here, the trial court concluded that the term "employment" in Section 12.3(a) of the Second Amendment "is not ambiguous, and that the natural use and meaning of that term as it is used within Section 12.3 is that in order to withdraw as a member, the member must voluntarily resign employment from

**2.** Contrary to Bennett's assertion at oral argument that three judges have decided that the term "employment" in the Second Amendment is unambiguous in favor of Bennett, neither the second nor the third trial court judges independently reviewed the basis for the first trial court judge's decision. Instead, the second trial court judge enforced a money judgment in favor of Bennett based on the first trial court judge's finding that Bennett never withdrew his membership from ME & LS. Similarly, the third trial court judge decided only that the second trial court judge intended for the money judgment to be a final order.

**3.** Neither party contends that the Operating Agreement, including the Second Amendment, are not fully integrated.

ME & LS." Based on that conclusion, the trial court also ruled that the members of ME & LS intended that the withdrawal provision apply only to ME & LS's direct employees. *See Selvig v. Blockbuster Enters., LC,* 2011 UT 39, ¶ 23, 266 P.3d 691 (" 'If the language of the contract is unambiguous, the intention of the parties may be determined as a matter of law based on the language of the agreement.' " (quoting *Peterson v. Sunrider Corp.,* 2002 UT 43, ¶ 18, 48 P.3d 918)). We reverse on both points.

## I. The Second Amendment Is Facially Ambiguous

¶ 11 We begin our analysis, as we must, by examining the four corners of the Operating Agreement, including its amendments. *See Bakowski v. Mountain States Steel, Inc.,* 2002 UT 62, ¶ 16, 52 P.3d 1179. Section 12.3(a) of the Second Amendment states that "a Member shall be deemed to withdraw when the Member voluntarily resigns or terminates the Member's employment with the Company [ (ME & LS) ] for reasons other than bankruptcy, death, disability or incompetency." Before the trial court and on appeal, the parties have asserted competing interpretations of Section 12.3(a). We conclude that the language of the Operating Agreement, as amended, reasonably supports both interpretations.

¶ 12 Bennett focuses on the word "Company," and argues that a member withdraws from ME & LS upon voluntarily resigning or terminating his employment only as a direct employee of ME & LS. In support of this interpretation, Bennett relies on the fact that he was paid by MEI and that he resigned from that company. Because the Second Amendment states that withdrawal occurs when a member "voluntarily resigns or terminates employment with the Company," and "Company" is defined as ME & LS, Bennett argues that the "plain and ordinary meaning" of that provision unambiguously limits it to members who resign or terminate their employment with ME & LS.

¶ 13 In contrast, ME & LS bases its argument on the word "employment," arguing that it should be interpreted broadly to include the relationship between ME & LS and its leased employees, like Bennett. According to ME & LS, a proper interpretation of Section 12.3(a) is that a member withdraws when he voluntarily resigns or terminates his employment with MEI because it necessarily results in the termination of his leased employment with ME & LS. Because ME & LS leases all of its employees from MEI to perform engineering and other services on its projects, ME & LS also argues that Bennett's construction would render the Second Amendment a nullity.

¶ 14 In determining whether the term "employment" is ambiguous, we consider relevant, extrinsic evidence. *See Daines v. Vincent,* 2008 UT 51, ¶¶ 25, 27, 190 P.3d 1269. In *Ward v. Intermountain Farmers Ass'n,* 907 P.2d 264 (Utah 1995), the Utah Supreme Court explained the rationale behind this practice, stating,

> [T]he determination of ambiguity is inherently one-sided, namely, it is based solely on the extrinsic evidence of the judge's own linguistic education and experience. Although the terms of an instrument may seem clear to a particular reader—including a judge—this does not rule out the possibility that the parties chose the language of the agreement to express a different meaning. A judge should therefore consider any credible evidence offered to show the parties' intention.

*Id.* at 268 (citation and internal quotation marks omitted). The court further noted that although there are some Utah decisions that would limit the judge's review to the language of the writing itself, "the better-reasoned approach is to consider the writing in light of the surrounding circumstances." *Id.* Subsequently, the supreme court clarified the *Ward* rule, *see Daines,* 2008 UT 51, ¶ 24, 190 P.3d 1269, to emphasize that the rule does not "allow surrounding circumstances to create ambiguity where the language of a contract would not otherwise permit," *id.* ¶ 27. Thus, we must determine whether the extrinsic evidence suggests at least two plausible meanings of "employment" as used in the Second Amendment, and whether each interpretation is " 'reasonably supported by the language of the contract.' " *Id.* (quoting *Ward,* 907 P.2d at 268).

¶ 15 Here, the extrinsic evidence includes Bennett's deposition testimony that he believed "everything . . . was supposed to have gone through the [limited liability companies], as far as the jobs, and that [MEI] was more of an administra[tor]." Bennett also admitted that "for all practical purposes, [his] work was for ME & LS." McNeil also testified by deposition. According to McNeil, "[MEI] does not actually perform any engineering services itself," and instead "lease[s] employees to the other McNeil limited liability companies" including ME & LS. Bennett was leased by MEI to ME & LS. Although Bennett argues that he did not have an "employment" relationship with ME & LS, he admits that MEI provided no engineering or surveying services. According to Bennett, while "employed" by MEI, he "rendered services on ME & LS projects as a leased 'employee' of and for MEI." However, Bennett acknowledges that "ME & LS has never had any employees."

¶ 16 ME & LS contends that because none of the members were direct employees of ME & LS, Bennett's interpretation of the Second Amendment would result in no member being capable of resigning or terminating his employment with ME & LS. Therefore, ME & LS argues that "employment" must include leased employees, otherwise the members' adoption of the Second Amendment was a meaningless act. According to ME & LS, the extrinsic evidence about how the companies operated supports a reading of "employment" to include employees who were leased to ME & LS. We agree.

¶ 17 When interpreting a contract we attempt to give effect to each provision, *see Green River Canal Co. v. Thayn*, 2003 UT 50, ¶ 17, 84 P.3d 1134, and "we look for a reading that harmonizes the provisions and avoids rendering any provision meaningless," *see Peterson & Simpson v. IHC Health Servs., Inc.*, 2009 UT 54, ¶ 13, 217 P.3d 716 (internal quotation marks omitted). Furthermore, "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." Restatement (Second) of Contracts § 203(a) (1981). Because the par-

ties agree that ME & LS had no direct employees, a member could terminate or resign from his employment with ME & LS only if employment includes the services provided to ME & LS on its projects by the employees it leased from MEI.

¶ 18 Nevertheless, Bennett argues that his interpretation of "the word employment clearly would have application had ME & LS decided, or should it at some point decide, to hire its own employees." Even if the Second Amendment was adopted to prepare for that possibility, ME & LS's interpretation is at least equally plausible in light of the evidence presented. Moreover, Bennett does not refer to any evidence to support his argument that the provision was intended to govern hypothetical, future member/employees of ME & LS.

## II. The Interpretation Advanced by ME & LS Is Reasonably Supported by the Language of the Contract

¶ 19 We now consider whether ME & LS's interpretation of "employment" is " 'reasonably supported by the language of the contract.' " *Daines v. Vincent*, 2008 UT 51, ¶ 27, 190 P.3d 1269 (quoting *Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 268 (Utah 1995)). Based on our review of the plain language of the Second Amendment, we conclude that it is.

¶ 20 Pursuant to the Second Amendment, a member of ME & LS is "deemed to withdraw when the Member voluntarily resigns or terminates the Member's employment with" ME & LS. As ME & LS notes, at least in the context of interpreting employment legislation, the Utah appellate courts have looked beyond the form of the employment arrangement to its substance. *See, e.g., Utah Home Fire Ins. Co. v. Manning*, 1999 UT 77, ¶¶ 18–19, 985 P.2d 243 (holding that a temporary employee was protected from suit for injuries sustained by other employees under the Workers' Compensation Act); *Kunz v. Beneficial Temps.*, 921 P.2d 456, 458–60 (Utah 1996) (holding that a employment service was not protected by the immunity from suit afforded to employers by the Workers' Compensation Act); *Ghersi v. Salazar*, 883 P.2d 1352, 1356

(Utah 1994) (adopting, for purposes of workers' compensation, the "loaned employee doctrine," providing that "if a labor service loans an employee to a special employer for the performance of work, then the employee, with respect to that work, is the employee of the special employer for whom the work or service is performed"); *Pro–Benefit Staffing, Inc. v. Board of Review of Indus. Comm'n,* 771 P.2d 1110, 1114 (Utah Ct.App. 1989) (holding that, for purposes of the Employment Security Act, leased employees were employed by the lessee company for whom they actually performed work, rather than the lessor company that ostensibly "employed" them); *ELM, Inc. v. M.T. Enters., Inc.,* 968 P.2d 861, 864–65 (Utah Ct. App.1998) (holding that a federal requirement that payroll reports be certified on public construction projects imposed an obligation on the client for which the employees performed services, not on the employee leasing company that provided the employees to the client). The imprecision about the definition of "employment" is also reflected by its dictionary definition, which states, "1: use, purpose; 2a: activity in which one engages or is employed <seeking gainful *employment* >; 2b: an instance of such activity; 3: the act of employing: the state of being employed <employment of a pen in sketching>." *Employment,* Merriam–Webster, http://www.merriam-webster. com/dictionary/employment (last visited Nov. 23, 2011). While employment may include "gainful" employment, it also includes "activity in which one engages." This definition supports both Bennett's and ME & LS's interpretations of "employment" as that term is used in the Second Amendment.

### III. The Parties Have Raised Issues of Fact that Cannot Be Resolved on Summary Judgment

¶ 21 When a contractual provision is facially ambiguous, we look to the parties' intent to resolve that ambiguity. *See Daines,* 2008 UT 51, ¶ 25, 190 P.3d 1269. Ambiguity with respect to the intent of the contracting parties presents "a question of fact where, if the judge determines that the contract is facially ambiguous, 'parol evidence of the parties' intentions should be admitted.'" *Id.* (quoting *Winegar v. Froerer,* 813 P.2d 104, 108 (Utah 1991)). In determining that intent, "[a] construction given to [a contractual provision] by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will when reasonable, be adopted and enforced by the court." *Upland Indus. Corp. v. Pacific Gamble Robinson Co.,* 684 P.2d 638, 642 (Utah 1984) (internal quotation marks omitted); *see also Okelberry v. West Daniels Land Ass'n,* 2005 UT App 327, ¶ 16, 120 P.3d 34. Thus, we now consider the evidence presented concerning the conduct of the parties. *See WebBank v. American Gen. Annuity Serv. Corp.,* 2002 UT 88, ¶ 19, 54 P.3d 1139 ("If a contract is ambiguous, the court may consider the parties' actions ... as evidence of the parties' true intention.").

¶ 22 First, the evidence regarding Bennett's prior statements about the effect of his resignation from MEI raises issues of fact about Bennett's contemporaneous understanding of the Second Amendment. Bennett's resignation states,

> I ... resign *as an employee of [MEI ]*.... In a recent meeting we had with the other members, it was implied that I am not pulling my weight and making *the company* enough money. I disagree with this comment and believe *I have been a key role in the success of [ME & LS ] ever since it has been organized.* I have put in an enormous amount of time and energy above and beyond my call of duty and away from my family *in helping the success of McNeil Engineering.* I feel that I need to change my priorities and put my family in front of my career.
>
> . . . .
>
> *... Due to the fact that I have contributed so much in building up the company over the years, I feel it fair that I receive at least current book value for my 252 interests (at least $695/interest) in a timely manner.*

(Emphases added). In the letter, Bennett resigns "as an employee of [MEI]," but when refuting the suggestion that he has not made

"the company enough money," he relies on his "key role in the success" of ME & LS. Then, although Bennett has only resigned from MEI, he seems to assume that this will trigger the repurchase of his shares in ME & LS under the Second Amendment and asks for "at least current book value" for those shares. At the very least, the letter reflects confusion by Bennett himself about the relationships among the various McNeil entities and the effect of his resignation from MEI. That confusion seems to be repeated in an affidavit Bennett submitted to the trial court during the litigation. In the June 29, 2006 affidavit, Bennett discusses the timing of his resignation and the development of his own competing company, as follows: "The office space for [my new company] . . . was secured in late, not early, August 2005, and I did not sign a lease for the office space until several days after I *resigned as a managing member of ME & LS*." (Emphasis added) (additional emphasis omitted). Bennett's resignation letter is dated August 17, 2005, thereby indicating that the reference in the affidavit to his "resign[ation] as a managing member of ME & LS" is to that letter. This understanding is supported by Bennett's further statements in the affidavit discussing other business dealings he had conducted "[s]ince leaving ME & LS."

¶ 23 While Bennett contends that he always intended the resignation from MEI to have no effect on his membership interest in ME & LS, we are convinced that there are factual issues in dispute on this question. Bennett is only one party to the Second Amendment, and therefore, his testimony must be weighed against testimony from the other parties to the Second Amendment as to the intended meaning of Section 12.3. Furthermore, ME & LS claimed at oral argument that at least one other member of ME & LS has disassociated himself from the McNeil companies and that his shares were absorbed by the remaining members. The manner in which the parties to the Operating Agreement treated the repurchase of another member's shares of ME & LS upon departure, including the details of that member's voluntary resignation or termination, can only be determined after further factual inquiry. Therefore, we reverse the trial court's finding that, as a matter of law, the parties intended "employment" to mean only direct employment with ME & LS.

## CONCLUSION

¶ 24 The term "employment" in the Second Amendment to the Operating Agreement is reasonably susceptible to each of the meanings advanced by the parties, and both of those meanings can be plausibly supported by the language of the Second Amendment. Therefore, we conclude that the trial court was incorrect in concluding that the term was unambiguous. Likewise, the extrinsic evidence indicates that there are issues of material fact in dispute concerning the parties' intent as to the proper construction of the Second Amendment. Therefore, we reverse the summary judgment in favor of Bennett and remand for further proceedings on the factual question of whether the parties intended that Bennett's resignation from MEI also terminated his employment with ME & LS, thereby constituting his withdrawal from ME & LS pursuant to the Second Amendment.

¶ 25 Reversed and remanded.

¶ 26 WE CONCUR: GREGORY K. ORME and WILLIAM A. THORNE JR., Judge.