IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| In the Matter of the Estate of Joseph R. Wilcock, | ) | OPINION |
| | ) | |
| Deceased. | ) | Case No. 20110095-CA |
| _____ | ) | |
| | ) | F I L E D |
| Teri Jo Wilcock Hull, | ) | (August 16, 2012) |
| | ) | |
| Petitioner and Appellant, | ) | 2012 UT App 223 |
| | ) | |
| v. | ) | |
| | ) | |
| Tamara L. Wilcock aka Tamara Sanderson, Todd J. Wilcock, and Joann S. Wilcock, | ) | |
| | ) | |
| | ) | |
| Heirs and Appellees. | ) | |

-----

Fourth District, Provo Department, 073400341
The Honorable Claudia Laycock

Attorneys:    Justin D. Heideman and Bradley J. Weber, Provo, for Appellant
             Mitchell D. Maughan and Todd A. Bradford, Spanish Fork, for
             Appellees

-----

Before Judges McHugh, Voros, and Christiansen.

McHUGH, Presiding Judge:

¶1 Teri Jo Wilcock Hull (TJ) appeals the trial court's ruling that her brother Todd J. Wilcock (Todd) is not required to reimburse $50,000 in life insurance proceeds and $250,000 in investment losses to the Wilcock Family Trust (the Trust). In particular, TJ challenges the trial court's denial of her motion for a new trial based on newly discovered evidence and the trial court's failure to impose discovery sanctions on Todd and their sister, Tamara L. Sanderson (Tam). TJ also argues that the trial court erred in admitting testimony relating statements of the decedent, Joseph R. Wilcock (Father), and by not awarding her attorney fees under Utah Code section 75-7-1004. *See generally* Utah Code Ann. § 75-7-1004 (Supp. 2012).[1] We affirm.


BACKGROUND

¶2 On April 14, 1997, Father and Shirlee D. Wilcock (Mother) created the Trust and, acting as the original trustees, transferred all of their real and personal property into it. Thereafter, Father and Mother used the Trust to manage all of their assets. TJ, Tam, and Todd (collectively, the siblings) are the only living children of Father and Mother and the only beneficiaries of the Trust. Mother died in 1997, and Father died in 2007.[2]

¶3 During Father's lifetime, the Trust owned a portfolio of stocks managed by Merrill Lynch. Father became disappointed with the rate of return earned by Merrill Lynch and approached each of his three children for help in managing the portfolio.

---

1. Because the relevant provisions of the Utah Code have not been materially changed, we cite the current version for the convenience of the reader.

2. Although the Trust was to become irrevocable upon Father's or Mother's death, the parties have not advanced any arguments based on the irrevocable nature of the Trust in the trial court or on appeal. Accordingly, we proceed under the assumption that all beneficiaries to the Trust consented to its revocation and to the distribution of the Trust assets. *See Nolan v. Hoopiiaina* (*In re Maluälani B. Hoopiiaina Trusts*), 2005 UT App 272, ¶ 14, 118 P.3d 861 ("An irrevocable trust may be revoked only if all beneficiaries thereof consent." (internal quotation marks omitted)), *aff'd as modified*, 2006 UT 53, 144 P.3d 1129.

Both TJ and Tam declined Father's request, but Todd agreed to assist with management of the portfolio. Thereafter, Todd "took an active role in managing, investing, trading, and selling stock, eventually losing approximately $250,000[]." TJ and Tam (collectively, the sisters) learned about this loss in approximately April 2004. Todd explained that he lost $250,000 of Trust assets in the stock market, and according to TJ, Todd never indicated that he would repay the money or that it would otherwise be restored to the trust. TJ also acknowledged that she never characterized the losses from the portfolio as a loan to Todd during Father's life.

¶4     The siblings' maternal grandfather (Grandfather) owned a $50,000 life insurance policy, naming the siblings' uncle (Uncle) as beneficiary. Prior to Grandfather's death, Grandfather permitted Todd "to surrender the cash value of the life insurance and invest it in the stock market." The trial court found that the insurance company paid Todd $41,357.25 as the surrender value of the policy and informed Todd that the IRS would send him a Form 1099R reflecting a taxable gain of $16,357.25. Todd testified that he paid capital gains tax on the amount reflected on the Form 1099R.

¶5     On April 5, 2004, TJ and Tam accompanied Father to a lawyer's office so that he could update his financial planning documents. While there, Father executed a document titled "Affidavit of Loans." The Affidavit of Loans recites that Todd "borrowed over $250,000 from my Trust," apparently referring to the funds Todd lost in the stock market, and also indicates that "[Todd] has received insurance monies in the amount of $50,000, which were to be divided with [TJ and Tam]." It then indicates that Todd did not distribute any of the $50,000 in insurance proceeds to the sisters or repay the $250,000 to the Trust and that the amounts are to be treated as interest-free loans from the Trust. The Affidavit of Loans also provides that the $82,000 Tam borrowed from the Trust shall be treated as a noninterest-bearing loan. The Affidavit of Loans concludes with a statement of Father's express intention that any loan amounts that remain unpaid at the time of his death "shall be taken from each child's share to the extent of his or her balance."

¶6     The trial court found that after executing the Affidavit of Loans, Father "became concerned and encountered some sleepless nights" because he felt that he had made a mistake in executing the document. As a result, Father asked Tam to help him draft a new affidavit, but she declined. However, a longtime friend of the family (Friend), who knew Father most of her life and helped care for him in his later years, agreed to assist

in drafting the new document. Father made several revisions to Friend's drafts. On April 15, 2004, Father read, approved, and signed the document titled "Affidavit of Trust." The Affidavit of Trust states that Todd "was entrusted with over $250,000 from [the] Trust," that he "lost this money and has not replaced" it, and that Father believed Todd should have taken "responsibility . . . for this." However, the Affidavit of Trust then recites that TJ and Tam "have decided that [Todd] would not be able to pay this back. But should admit his wrong doing." The document also indicates that Todd received $50,000 in life insurance proceeds, "which were to be divided with [TJ and Tam]." The next sentence states, "To date he has not distributed these amounts [sic] shall be treated as loans in favor of my estate and shall not accrue interest." The document further recites that the $82,000 Tam borrowed from the Trust "shall also be treated as a loan in favor of my Trust Estate and shall also not accrue interest." At the end of the document, Father directs how the unpaid balance of the loans will be treated at the time of his death. Although the Affidavit of Trust gives specific instructions for the satisfaction of any unpaid balance of the insurance proceeds and the loan to Tam, it makes no mention of any repayment directions in the event that the $250,000 in stock losses remained unpaid at the time of Father's death. Instead, after Father's instructions concerning the insurance money and the unpaid balance of Tam's loan, the Affidavit of Trust states that "the amounts left [in the Trust] shall be divided between the three children." Todd was not aware of the existence of either the Affidavit of Loans or the Affidavit of Trust until shortly before Father passed away.

¶7      On May 10, 2007, approximately three years after Father executed the Affidavit of Loans and the Affidavit of Trust, Todd drafted and Father executed a new document, titled Affidavit of Trust/Loans/Stewardship (Affidavit of Stewardship). In this document, Father indicates that Todd "was directed to manage [the Trust's] stocks in the amount of $250,000," and despite his initial reluctance, he agreed to do so. The Affidavit of Stewardship further recites that Todd agreed to invest $44,000 from the life insurance policy surrendered by Grandfather, which he also lost in the stock market. The Affidavit of Stewardship then states in bold type that Todd "should not be held responsible for these losses and will receive equal Trust Assets along with his sisters." When Father signed this document, on May 10, 2007, Todd and Tam were present, as was a banker and notary public (Banker), who had done business with Father for over twenty years.

¶8     Before notarizing the documents, Banker spoke with Father for fifteen to twenty minutes, and although Father was shaky and wobbly on his feet, Father did not appear to be confused.  Banker also indicated that prior to notarizing the Affidavit of Stewardship, he asked Father several questions to ascertain whether Father had the requisite mental capacity to sign the document.  Banker told the court that he would not have notarized the documents if he had any doubts as to Father's competency.  Only after assuring himself of Father's competency did Banker allow Father to execute the Affidavit of Stewardship, which Banker then notarized.

¶9     Approximately a week later, Father fell, striking the left side of his chest and puncturing his lungs.  Father chose to forego a painful procedure to drain his lungs, which likely would have saved his life.  He made this decision himself, dealing directly with his treating physicians.  Father died on May 19, 2007.  At that time, he did not own any assets outside of the Trust, and the Trust owned six separate parcels of real property, several bank accounts, and various items of personal property.

¶10    After Father's death, TJ was appointed personal representative and brought a probate action, later converted to an action to dissolve the Trust and distribute its assets.  Among other things the siblings disputed, TJ disagreed with Todd and Tam concerning the distribution of the Trust assets.  According to TJ, Todd's share should be reduced by the $50,000 in life insurance proceeds and the $250,000 in investment losses.

¶11    A bench trial began on August 30 and was expected to conclude on September 2, 2010.  On the third day of trial, the parties acknowledged that they would not finish in the time allotted.  They asked the court to bifurcate the trial between issues it could decide based on the evidence already heard and those reserved for a second phase of trial.  Although the parties were hopeful that they could resolve the reserved issues themselves, they agreed to a second phase trial date of September 17, 2010, in the event that those attempts were unsuccessful.  The two issues to be decided in the first phase (Phase I) of trial, based on the three days of evidence already presented, were whether Todd was obligated to repay the trust the $250,000 and the $50,000 from the life insurance policy.

¶12    The trial court issued its written Findings of Fact and Conclusions of Law as to those Phase I issues on February 25, 2011.  It found that during the course of Friend's interactions with Father while drafting the Affidavit of Trust, Father indicated that he

and Todd managed the stock portfolio together and "that they both had made a mistake." The trial court also found that Father told Friend that "the loss of the proceeds from the portfolio was forgiven and [that Father] affirmed that this was what he wanted to do." It further found that approximately one month after executing the Affidavit of Trust, Father reaffirmed to Friend his intent to forgive Todd for the loss of the $250,000. In weighing the testimony, the trial court found Friend to be "a credible and impartial witness and relied heavily on her testimony," noting that Friend "had nothing to gain from the outcome of the action." The trial court also found Tam's testimony that Father told her that he and Todd had invested the $250,000 together credible.

¶13    Based primarily on this testimony, the trial court first determined that Father's "intent was to attempt to correct any mistakes or poor choices he may have made in [the Affidavit of Loans] and replace it with [the Affidavit of Trust], something he thought would better reflect his feelings at the time."[3] The trial court then concluded that the Affidavit of Trust was ambiguous because the only reference to the $250,000 was in the beginning of the document and it was never referred to as a loan. The court explained that if Father intended to forgive the $250,000 he never said so in the document, but on the other hand, the document did not indicate that Todd was to repay the money or that it should be deducted from his share of the Trust assets.

¶14    Because the trial court could not determine Father's intent with regard to the $250,000 from the Affidavit of Trust alone, it looked to extrinsic evidence to determine its meaning. Relying primarily on the testimony from Friend and Tam, the court determined that the Affidavit of Trust's provision that "[Todd] should admit his wrong doing," did not require Todd to admit his wrongdoing before the amount would be forgiven. In addition, the trial court relied on the fact that Father had asked each of the siblings to help him manage the Trust's stock portfolio but only Todd agreed to do so. Ultimately, the trial court found that in the Affidavit of Trust, Father intended to relieve Todd of any obligation with respect to the stock market losses.

¶15    Next, the trial court considered the effect of the Affidavit of Stewardship, executed three years after the Affidavit of Trust. TJ argued that Father executed the

_____

3. TJ does not challenge the trial court's determination that the Affidavit of Trust replaced the Affidavit of Loans.

Affidavit of Stewardship due to the undue influence of her siblings and that it did not reflect Father's wishes. To resolve that issue, the trial court relied on testimony from Tam and Banker, both of whom it found to be credible, and on testimony from Friend, the person the court determined "to be in all probability the most credible witness." It also found persuasive the fact that immediately prior to his death, only nine days after executing the Affidavit of Stewardship, Father's doctors considered him competent enough to make his own decision of whether to forgo a potentially lifesaving medical procedure. Based upon all of the evidence, the trial court determined that "[Father] was competent and knew what he was doing up to the day that he passed away," and that the Affidavit of Stewardship had been validly executed. Additionally, the trial court concluded that the Affidavit of Stewardship was merely a "clarification" of the first few sentences of the Affidavit of Trust and "ma[de] it very clear that Todd should not be responsible for the[] losses and will receive equal Trust Assets along with his sisters." The trial court referred to the Affidavit of Stewardship as "seal[ing] the deal," meaning that it reaffirmed Father's intent in the Affidavit of Trust to forgive Todd's loss of the $250,000.

¶16    With respect to the $50,000 of life insurance proceeds, the court determined that Father was not "in any position to take control of, make allowances or decisions or otherwise dictate the distribution of the life insurance monies, as he may have attempted to do in [the Affidavit of Loans, the Affidavit of Trust, and the Affidavit of Stewardship]." The court reasoned that Father was neither the owner nor the beneficiary of the policy and that the insurance company paid the money to Todd without restriction. Accordingly, the trial court determined that the $50,000 was not a part of the Trust estate and that Father had no authority to dictate its distribution to the sisters.

¶17    On September 15, 2010, before trial on the remaining issues, TJ filed a motion for a new trial with respect to the issues decided by the trial court in Phase I. The basis of the motion was that TJ's husband (Husband) had discovered new evidence in online records of the Utah County Recorder's Office. Specifically, Husband found a Certification of Trust related to the "Farm Property" (Certification) that was signed by Tam and Todd on May 9, 2007, one day before Father signed the Affidavit of Stewardship. The Certification states that Todd and Tam are the cotrustees of the Trust because "[Father] is incapacitated and no longer qualified to act as Trustee under the

terms of the Trust."[4] TJ claimed that this newly discovered evidence warranted a new trial because it proved that Father was not competent when he executed the Affidavit of Stewardship.

¶18    In denying TJ's motion, the trial court reasoned that although the evidence was material and competent, it was a public record that TJ could have discovered before trial if she had exercised reasonable diligence. The trial court also determined that even if the Certification had been presented at the first trial, it was unlikely that the result would have been different. First, the trial court explained that there was compelling evidence of Father's competence when he executed the Affidavit of Stewardship, including the testimony of Banker and the fact that Father's doctors allowed him to make his own end-of-life decisions. Second, the court determined that the Affidavit of Stewardship merely reiterated the intent contained in the Affidavit of Trust, signed by Father before there was any question as to his competence, to forgive Todd of the $250,000 in losses. TJ now appeals.


ISSUES AND STANDARDS OF REVIEW


¶19    First, TJ contends that the trial court erred by denying her motion for a new trial based on newly discovered evidence. In denying a motion for a new trial, the trial court has considerable discretion, and we will reverse its decision "only for a clear abuse" of that discretion. *See Olsen v. Olsen*, 2007 UT App 296, ¶ 9, 169 P.3d 765 (internal quotation marks omitted).

¶20    Second, TJ argues that the trial court erred by denying her motion to impose discovery sanctions on Todd and Tam. We review a trial court's decision to deny discovery sanctions for an abuse of discretion. *See Bodell Constr. Co. v. Robbins*, 2009 UT 52, ¶ 16, 215 P.3d 933.

---

4. According to Todd and Tam, the Certification was executed at Father's request in order to allow them to handle a boundary line agreement relating to real property owned by the Trust. The trial court presumed that the Certification was prepared by the same title company that drafted the boundary line agreement and not by Todd and Tam.

¶21    Third, TJ argues that the trial court erred in its interpretation and enforcement of the Trust documents. A trial "court's interpretation of a 'trust instrument is a question of law,' which we review for correctness." *Lakeside Lumber Prods. v. Evans*, 2005 UT App 87, ¶ 8, 110 P.3d 154 (quoting *Jeffs v. Stubbs*, 970 P.2d 1234, 1251 (Utah 1998)). Thus, the trial court's determination of whether the life insurance proceeds were part of the Trust assets is an issue of law that we review for correctness. *Cf. id.* Likewise, the issue of "whether a [document] is ambiguous is a question of law" that we review for correctness. *See Tangren Family Trust v. Tangren*, 2008 UT 20, ¶ 10, 182 P.3d 326. However, if a trust document is ambiguous and the trial court admits extrinsic evidence to interpret it, the trial court's decision as to the intent of the trustor is a factual determination that we review under a clearly erroneous standard. *Cf. Daines v. Vincent*, 2008 UT 51, ¶ 25, 190 P.3d 1269 (noting that the admission of parol evidence in interpreting a facially ambiguous contract presents a question of fact); *Edwards v. Powder Mountain Water & Sewer*, 2009 UT App 185, ¶ 13, 214 P.3d 120 (noting questions of fact are reviewed under a clearly erroneous standard); *see also Makoff v. Makoff*, 528 P.2d 797, 798 (Utah 1974) ("The general rules of construction of written instruments apply to the construction of trust instruments . . . ."); *In re Hamilton*, 869 P.2d 971, 975 (Utah Ct. App. 1994) ("The factual issue of the decedent's intent is one we review with deference to the trial court's findings, if adequate, and we reverse only upon a finding of clear error.").

¶22    Fourth, TJ contends that the trial court erred in admitting Father's statements regarding the Trust documents because they were inadmissible hearsay. "In reviewing the admissibility of hearsay, legal conclusions are reviewed for correctness, factual determinations are reviewed for clear error, and the ultimate question of admissibility is reviewed for abuse of discretion." *State v. C.D.L.*, 2011 UT App 55, ¶ 29, 250 P.3d 69, *cert. denied*, 255 P.3d 684 (Utah 2011).

¶23    Finally, TJ contends that the trial court erred in denying attorney fees to her under Utah Code section 75-7-1004. *See* Utah Code Ann. § 75-7-1004 (Supp. 2012). "[T]he appropriate standard for reviewing equitable awards of attorney fees is abuse of discretion." *Fisher v. Fisher*, 2009 UT App 305, ¶ 8, 221 P.3d 845 (alteration in original) (internal quotation marks omitted). "[W]e give no deference to the trial court's determination as to whether attorney fees were allowed under a statute." *Id.* ¶ 8.

ANALYSIS

I. New Trial, Rule 37 Sanctions, and Insurance Proceeds

A. New Trial

¶24    Rule 59 of the Utah Rules of Civil Procedure provides the circumstances under which the trial court may grant a new trial or reopen the evidence at a bench trial based on evidence discovered after the court's initial ruling. *See* Utah R. Civ. P. 59(a). It provides that a new trial may be granted if there is "[n]ewly discovered evidence, material for the party making the application, which he could not, with reasonable diligence, have discovered and produced at the trial." *See id.* R. 59(a)(4). To satisfy this rule, the moving party must prove that the evidence satisfies four requirements:

> (1) "[I]t must be material, competent evidence which is in fact newly discovered," (2) "it must be such that it could not, by due diligence, have been discovered and produced at trial," (3) "it must not be merely cumulative or incidental, but must be of sufficient substance that there is a reasonable likelihood that with it there would have been a different result," and (4) it "must relate to facts which were in existence at the time of trial."

*See In re C.L.*, 2007 UT 51, ¶ 12, 166 P.3d 608 (alteration in original) (citation and additional internal quotation marks omitted) (quoting *In re J.P.*, 921 P.2d 1012, 1017 (Utah Ct. App. 1996)). "If the moving party fails to establish any one of these elements, a new trial may not be granted." *Id.* ¶ 13. Accordingly, because we determine that the trial court did not exceed its broad discretion in determining that the Certification would not be reasonably likely to affect the outcome of a new trial, we do not address the remaining elements. *See id.*; *see also Olsen v. Olsen*, 2007 UT App 296, ¶ 9, 169 P.3d 765 ("Rulings on motions for a new trial are addressed to the sound discretion of the trial court, and its decision will be reversed on appeal only for a clear abuse thereof." (internal quotation marks omitted)).

¶25    TJ contends that the trial court erred in determining that there was no reasonable likelihood that there would be a different result, even if the Certification was admitted

at a new trial. In making this argument, TJ relies heavily on the trial court's statement that the Affidavit of Stewardship "seal[ed] the deal" that Todd would not be responsible for the $250,000. However, the trial court determined that it would have upheld the validity of the Affidavit of Stewardship even if the Certification had been presented at the first trial. The court explained that the Affidavit of Stewardship "was in addition to [the Affidavit of Trust,] which had been written three years before," and that the Affidavit of Stewardship was meant to "clarify any ambiguities" in the Affidavit of Loans and the Affidavit of Trust. In essence, the trial court ruled that the Certification did not affect its ruling that the Affidavit of Trust, drafted before Father's competence was at issue, relieved Todd of any obligation to repay the $250,000.

¶26    The trial court's ruling that there is no reasonable likelihood that the result at a new trial would be different is based on its interpretation of the Affidavit of Trust. Thus, we first review the trial court's conclusion that the Affidavit of Trust is ambiguous and its use of extrinsic evidence to resolve any ambiguity. We then analyze whether the admission of the Certification would affect the outcome of the case based on the correct interpretation of the Affidavit of Trust.

1.    The Trial Court Correctly Determined that the Affidavit of Trust Is Ambiguous and Properly Considered Extrinsic Evidence

¶27    "The primary object of a court, in construing the provisions of a trust, is to carry out the intent of the trustor or trustors." *In re Gerber*, 652 P.2d 937, 939 (Utah 1982). We must look first to the language of the trust instrument to determine the settlor's intent, and we may only look beyond that language if the trust is ambiguous. *See Perrenoud v. Harman*, 2000 UT App 241, ¶ 13, 8 P.3d 293 (citing *Makoff v. Makoff*, 528 P.2d 797, 798 (Utah 1974)); *see also Jeffs v. Stubbs*, 970 P.2d 1234, 1251 (Utah 1998) ("[I]n determining whether a trust is charitable, a court must look to the language of the trust instrument and may not look beyond it unless the instrument's language does not resolve the issue."). When a court determines that a trust is ambiguous, it may consider extrinsic evidence in light of the trust language to determine the settlor's intent. *See Makoff*, 528 P.2d at 798 ("[I]n ascertaining the intention of the settlor we may consider the entire instrument aided by the surrounding circumstances existing at the time of creation of the trust."); *see also* 90 C.J.S. *Trusts* § 228 (2012) ("Parol or extrinsic evidence may be admitted to aid in construing a trust instrument only if the instrument is ambiguous or uncertain, and only to explain, and not to contradict, it."). In contrast, "[i]f the language

within the four corners of the [trust] is unambiguous, the parties' intentions are determined from the plain meaning of the [trust] language, and the [trust] may be interpreted as a matter of law." *See McNeil Eng'g & Land Surveying, LLC v. Bennett*, 2011 UT App 423, ¶ 8, 268 P.3d 854 (internal quotation marks omitted).

¶28    To determine whether a trust instrument is ambiguous, we apply the same standards as with other written instruments. *See Makoff*, 528 P.2d at 798. Accordingly, we "consider each [trust] provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none." *See McNeil Eng'g*, 2011 UT App 423, ¶ 8 (omission in original) (internal quotation marks omitted). "A [trust] term or provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Id.* (internal quotation marks omitted).

¶29    The Affidavit of Trust states, in relevant part:

> I [Father], hereby certify that my son [Todd], was intrusted with over $250,000[] from my Trust. In which he lost this money and has not replaced or tr[ied] to make good on this said money.
>
> To which I feel as though he should have t[aken] responsibility, for this and has yet to do so. But the girls [TJ] and[ Tam] have decided that he as in [Todd] would not be able to pay this back. But should admit his wrong doing. [Todd] has also received insurance monies in the amount of $50,000[] which were to be divided with my two daughters [TJ] and [Tam]. To date he has not distributed these amounts shall be treated as loans in favor of my estate and shall not accrue interest [sic].
>
> My daughter [Tam], has also borrowed $82,000 from my Trust.
>
> This amount shall also be treated as a loan in favor of my Trust Estate and shall also not accrue interest.

> She my daughter has been paying back monthly payments as a show[ing] of good faith.
>
> At the time of my death what is left owing on [Tam's] loan she will not have to pay this amount owing back. Because half of what is owed will be given to my daughter [TJ] from the trust and the monies owing from the Insu[r]ance monies will be divided two ways, if my son [Todd] hasn't made good on the insurance monies he was entrusted to him to handle. Then the insurance monies should be divided between the two daughters [TJ] and [Tam] from my Trust Estate and then the amounts left shall be divided between the three children.

¶30 The trial court carefully reviewed this document, stating that the

> only reference to the $250,000[] is contained within the first five sentences of the document. The remainder of the document . . . never refers to the $250,000[]. [It] also never calls the $250,000[] a "loan." Considering the document as a whole, the Court cannot ascertain [Father]'s intent with respect to the $250,000[].

The trial court noted that the Affidavit of Trust indicates that the $50,000 in "insurance monies should be held against Todd and taken out of his share but does not include the $250,000[] obligation in this language." Thus, the court concluded that the plain language could be interpreted either as relieving Todd of any obligation to repay the $250,000 or as requiring that the $250,000 be deducted from his share of the Trust assets. Due to these two reasonable interpretations of the Affidavit of Trust, the trial court concluded that it was ambiguous and looked to extrinsic evidence to ascertain Father's intent.

¶31 TJ disagrees with the trial court's assessment that the Affidavit of Trust is ambiguous and argues instead that it should not have considered extrinsic evidence. She claims that the statement "these amounts shall be treated as loans" must refer to both the $250,000 and the $50,000 because the "$50,000[] insurance monies is one

amount—singular.  Indeed [the immediately preceding sentence] expressly confirms that the insurance monies is an 'amount.'"  To support this position, TJ notes that the document later states that the $50,000 "should be divided between the two daughters" and that if "these amounts" referred only to the insurance monies, the subsequent statement would be repetitive.  TJ asserts that "[t]aken together, the only conclusion is that 'these amounts' . . . refer[s] to both the $250,000[] and the $50,000[]."

¶32    While TJ's interpretation is not unreasonable, we conclude that the trial court correctly held that the Affidavit of Trust is ambiguous.  In the beginning of the document, Father never expressly states that the $250,000 is to be treated as a loan, instead indicating that the sisters decided that Todd cannot repay the money, "[b]ut [that Todd] should admit his wrong doing."  Contrary to TJ's assertions, the rest of the document does not eliminate this ambiguity.  Nor do we agree that the use of the plural in the directive that "*these amounts* shall be treated as loans in favor of my estate and shall not accrue interest," must refer to both the $250,000 in portfolio losses and the $50,000 of life insurance proceeds because it uses the plural "amounts."  (Emphasis added.)  The Affidavit of Trust appears to use the singular and plural interchangeably.  While TJ is correct that the prior sentence refers to the $50,000 as an "amount," it also refers to it as "insurance monies" and indicates that they "were" to be shared with the sisters.  Furthermore, the critical sentence is obviously incomplete, stating, "To date he has not distributed these amounts shall be treated as loans in favor of my estate . . . ."  A word or phrase is missing either after "distributed" or after "these amounts."  A comparison of the Affidavit of Loans and the Affidavit of Trust suggests that the sentence including the reference to "these amounts" may have been imported from the prior document, with less than careful editing.  Father might have intended the Affidavit to state, "To date he has not distributed [the insurance monies and] these amounts shall be treated as loans in favor of my estate and shall not accrue interest."  And there is nothing in the document suggesting that Todd was expected to share the $250,000 with the sisters, but it expressly states that the insurance monies "were to be divided with [Father's] two daughters."  Thus, the statement that "[t]o date he has not distributed these amounts" logically could refer only to the money Todd was expected to distribute, the insurance proceeds.  Finally, in the last few sentences of the document, Father refers to the loan from the Trust to Tam and the "moneys owing" from Todd due to the insurance proceeds, and directs how any unpaid balance should be repaid upon his death.  Noticeably absent from those instructions is any mention of the $250,000 in investment losses.  This omission could reasonably be interpreted to support the

argument that Father relieved Todd of any obligation to repay the $250,000 in the first part of the document. Thus, the trial court correctly determined that the Affidavit of Trust is ambiguous because it can be interpreted as either relieving Todd of any obligation to repay the $250,000, or as treating the $250,000 as a loan from the estate that must be repaid from Todd's share of the Trust assets.

¶33 We now examine whether the trial court properly resolved that ambiguity based on the extrinsic evidence of Father's intent. *Cf. Makoff v. Makoff*, 528 P.2d 797, 798 (Utah 1974). "It is the province of the trier of fact to assess the credibility of witnesses, and we will not second-guess the trial court where there is a reasonable basis to support its findings." *Salt Lake City v. Hughes*, 2011 UT App 128, ¶ 5, 253 P.3d 1118 (internal quotation marks omitted). That evidence included Friend's testimony that while she was assisting Father with the Affidavit of Trust, Father told her that he and Todd both made a mistake and that "the loss of the [$250,000] . . . was forgiven." The trial court found that Friend "was a credible and impartial witness and relied heavily on her testimony." The court was also persuaded by Tam, who testified that Father told her that he and Todd invested the money together and that the stock trading was a joint effort. Based on this testimony, the court concluded that Father intended to forgive Todd "of any obligation to repay the $250,000[]" in the Affidavit of Trust. TJ has not challenged any of these findings on appeal. Accordingly, we affirm the trial court's interpretation of the Affidavit of Trust as relieving Todd of any obligation to repay the $250,000 of investment losses.

    2.     There Is Not a Reasonable Likelihood that Admission of the Certification Would Affect the Outcome of the Case

¶34 We next review the trial court's determination that the Certification that indicated Father was incompetent would not affect the outcome of the case in a new trial. Because the Affidavit of Trust forgave Todd of any responsibility with respect to the $250,000, the trial court was convinced that the Affidavit of Stewardship would not affect its analysis on that issue. Because we have affirmed the trial court's conclusion that Father intended to relieve Todd of any obligation to repay the $250,000 when he executed the Affidavit of Trust, we agree that even if the Certification rendered the Affidavit of Stewardship invalid, the result would not change.

¶35    Nevertheless, TJ argues that the existence of the Certification would call into question Todd's and Tam's veracity generally, thereby affecting the outcome of the litigation.  As previously discussed, however, the trial court relied primarily on the testimony from Friend in resolving the ambiguity in the Affidavit of Trust.  Because there is no evidence that Friend was present when Father executed the Certification three years later, the Certification does not call into question Friend's credibility as to Father's intention when he executed the Affidavit of Trust.  Furthermore, TJ does not challenge the trial court's finding that while they were drafting the Affidavit of Trust, Father told Friend he wanted to forgive the $250,000.  Under these circumstances, we are not convinced that the trial court exceeded its discretion in determining that admission of the Certification would not have changed the outcome at trial.

B.  Discovery Sanctions

¶36    TJ contends that the trial court erred in denying her motion for discovery sanctions under rule 37 of the Utah Rules of Civil Procedure.[5]  Rule 37 of the Utah Rules of Civil Procedure provides that a trial court may impose sanctions on a party for its failure to make required disclosures.  *See* Utah R. Civ. P. 37(f) (detailing the consequences of failing to make required disclosures, including that the trial court may impose sanctions under subsection (b)(2)).  However, "[b]efore a trial court can impose discovery sanctions under rule 37, the court must find on the part of the noncomplying party willfulness, bad faith, or fault, or persistent dilatory tactics frustrating the judicial process."  *Morton v. Continental Baking Co.*, 938 P.2d 271, 274 (Utah 1997) (citations and internal quotation marks omitted).  We review a trial court's denial of "discovery sanctions under an abuse of discretion standard."  *See Bodell Constr. Co. v. Robbins*, 2009 UT 52, ¶ 16, 215 P.3d 933; *see also Morton*, 938 P.2d at 974 ("Because trial courts must deal first hand with the parties and the discovery process, they are given broad discretion regarding the imposition of discovery sanctions." (internal quotation marks

---

5.  Because amendments to the Utah Rules of Civil Procedure effective November 1, 2011, made significant changes to the discovery rules, we cite the preamendment version of rule 37.  *See* Utah R. Civ. P. 1 advisory committee note ("Due to the significant changes in the discovery rules, the Supreme Court order adopting the 2011 amendments makes them effective only as to cases filed on or after the effective date . . . unless otherwise agreed to by the parties or ordered by the court.").

omitted)).  "In applying the abuse of discretion standard to the district court's" denial of discovery sanctions,

> we give the district court "a great deal of latitude in determining the most fair and efficient manner to conduct court business" because the district court judge "is in the best position to evaluate the status of his [or her] cases, as well as the attitudes, motives, and credibility of the parties."

*See Bodell Constr.*, 2009 UT 52, ¶ 35 (alteration in original) (quoting *Morton*, 938 P.2d at 275).

¶37    Here, TJ challenges the trial court's ruling denying her motion to sanction Todd and Tam for their failure to produce the Certification in response to Request for Production No. 7 (the Request).[6]  The Request states, "Please provide any and all documents, including development plans or the like, involving any real properties of the Estate."  Although the Trust owned four separate properties at the time of the Request, Todd and Tam provided TJ only with documentation related to the Wilcock Vistas property.  TJ never objected to this response.  For the first time, with her motion for a new trial, TJ argued that Todd and Tam's response to the Request was deficient and that discovery sanctions were warranted because the Certification had not been produced.  The trial court disagreed, determining that the parties were focused on the development of Wilcock Vistas at the time the Request was sent and that they were not concerned about the other properties at that time.  On appeal, TJ now contends that the plain language of the Request encompasses the Certification, which was a document related to the Trust's Farm Property, and that therefore, the trial court erred in interpreting the Request more narrowly.

---

6. TJ also argues that Todd and Tam failed to disclose a key witness.  However, TJ first raised this issue in a reply memorandum to the trial court.  "Where a party 'first raise[s an] issue in [her] reply memorandum, it [is] not properly before the trial court and we will not consider it for the first time on appeal.'"  *Stevens v. LaVerkin City*, 2008 UT App 129, ¶ 31, 183 P.3d 1059 (alterations in original) (quoting *State v. Phathammavong*, 860 P.2d 1001, 1004 (Utah Ct. App. 1993)).

¶38    While we agree that the language of the Request is broad enough to include the Certification, we cannot conclude that the trial court exceeded its discretion in denying sanctions.[7] The trial court held a hearing on the failure to produce the Certification and carefully considered the concerns of each party.[8] Although the trial court did not take evidence at this hearing, neither party sought to introduce any evidence concerning Todd and Tam's reasons for not producing the Certification. Instead, TJ wanted to call Banker to establish that he would not have notarized the Affidavit of Stewardship if he had known about the Certification.[9] Thus, the trial court relied on its own familiarity with the trial court proceedings to reject TJ's motion for sanctions. We defer to the trial court's assessment of the focus of the litigation when Tam and Todd produced only the Wilcock Vistas documents because it observed the proceedings firsthand and was in the best position to evaluate the attitudes and motivations of the parties when the Request was sent. *See, e.g.*, *Bodell Constr.*, 2009 UT 52, ¶ 35. Thus, although the language of the Request appears to encompass documentation relating to all of the properties, we cannot say that the trial court abused its discretion when it determined that the focus of

---

7. Todd and Tam argue that the trial court could not impose sanctions because TJ never moved to compel the production of documents related to other Trust properties. However, a trial court may impose discovery sanctions in some circumstances, even in the absence of an objection or motion to compel. *See* Utah R. Civ. P. 37(b)(2) (providing that a trial court may impose discovery sanctions for a party's "fail[ure] to obey an order to provide or permit discovery"); *id.* R. 37(f) ("If a party fails to disclose a . . . document or other material . . . the court on motion may take any action authorized by Subdivision (b)(2)."); *see also Rukavina v. Sprague*, 2007 UT App 331, ¶ 8, 170 P.3d 1138 (deciding that the trial court could impose discovery sanctions, even in the absence of a motion to compel, where the party had failed to comply with the court's discovery orders); *Stevenett v. Wal-Mart Stores, Inc.*, 1999 UT App 80, ¶¶ 23-24, 977 P.2d 508 (holding that the trial court did not err in sanctioning a party where the party failed to supplement her answers to discovery requests in violation of a scheduling order and the trial court found fault in accordance with a prior version of rule 37).

8. This hearing also addressed the motion for a new trial.

9. The trial court determined that this speculative testimony would not be helpful to its determination, but allowed TJ to make a proffer as to Banker's testimony.

the litigation had evolved such that only documentation related to Wilcock Vistas was relevant.[10]

C. The Insurance Proceeds

¶39     TJ also contends that the trial court erroneously concluded that the $50,000 in life insurance proceeds was not part of the Trust estate.  Specifically, TJ challenges the trial court's determination that "[Father] was not in any position to take control of, make allowances or decisions or otherwise dictate the distribution of the life insurance monies, as they were never part of the Trust estate."  Instead, TJ argues that these proceeds were a trust asset and should have been treated as a loan against Todd's share of the estate.

¶40     In reviewing TJ's claim, we note that there is no dispute regarding the underlying facts relied on by the trial court.  Accordingly, whether these assets were part of the trust estate is an issue of law that we review for correctness.  *See Davis v. Young*, 2008 UT App 246, ¶¶ 8-9, 190 P.3d 23.  In order for a trust to be created, either property must be transferred "to another person as trustee during the settlor's lifetime" or the owner of the property must declare that he is holding the identified property as trustee.[11]  *See* Utah Code Ann. § 75-7-401(1)(a)-(b) (Supp. 2012); *see also In re West*, 948 P.2d 351, 353 (Utah 1997) (noting, in a decision prior to Utah's adoption of the Uniform Trust Code, that to create a trust the settlor "'must have an intent to create a presently

---

10.  Although we defer to the trial court's judgment on this issue, from our less informed position with respect to the trial court proceeding, Todd and Tam's failure to produce the Certification is at least suspicious.  Admittedly, TJ served no discovery specifically directed at obtaining information relevant to Father's competence when he executed the Affidavit of Stewardship.  Nevertheless, TJ had raised that issue, and the explanation that Todd and Tam forgot about a document expressly proclaiming Father's incompetence, executed by Tam and Todd only a day before Father signed the Affidavit of Stewardship, seems open to question.

11.  Although a trust may also be created by "exercise of a power of appointment in favor of a trustee," this method of trust creation is not at issue in this case.  *See* Utah Code Ann. § 75-7-401 (Supp. 2012).

enforceable trust, . . . the trust property must be clearly specified and set aside, . . . and the essential terms of the trust must be clear enough for the court to enforce the equitable duties that are the sine qua non of a trust relationship'" (omissions in original) (emphasis omitted) (quoting *Sundquist v. Sundquist*, 639 P.2d 181, 183-84 (Utah 1981))). Once a trust is created, the trustee "may exercise . . . powers conferred by the terms of the trust." Utah Code Ann. § 75-7-813(1). The Trust in this case confers upon the trustee

> the power and authority to manage and control the Trust [e]state in such manner as the Trustee may deem advisable; and, he shall have, enjoy, and exercise all powers and rights over and concerning the Trust [e]state and the proceeds thereof as fully and amply as though the Trustee were the absolute owner of the same . . . including by way of illustration and not of limitation the . . . power[] . . . [t]o convey, dispose, and sell any trust property . . . .

Thus, Father, as the trustee here, would have power to direct the distribution of the life insurance proceeds if they were part of the Trust estate or "proceeds thereof."

¶41    We agree with the trial court that the insurance proceeds were never made part of the Trust. Grandfather was the owner of the insurance policy, and the sole beneficiary was Uncle. Grandfather authorized Todd to surrender the policy for its cash value and to invest those proceeds in the stock market. Upon surrender, the insurance company delivered the proceeds to Todd, and he testified that he paid the capital gains taxes incurred as a result. Indeed, TJ's trial counsel struggled to explain how the cash obtained from Grandfather's life insurance policy became part of the Trust. There was no evidence that either Mother or Father, the original trustors, had an interest in the policy, and TJ's counsel eventually conceded that Father was not an heir of his father-in-law's estate. Additionally, even if the money was a loan to Todd, it was a loan from Grandfather, not the Trust. On appeal, TJ again fails to explain how the life insurance proceeds became part of Father's Trust. Accordingly, Father's position as trustee did not give him the authority to direct the distribution of the insurance proceeds.

¶42 In the alternative, TJ contends that Father was authorized to direct the distribution of Trust assets disproportionately as "an adjustment" or "offset" to Todd's receipt of the insurance proceeds outside of the Trust. TJ argues that "such determinations are commonplace in modern estate planning. Grantors and trustees regularly motivate behavior by indicating certain actions as conditions precedent to actual inheritance." However, TJ offers no citations to support these assertions. *See* Utah R. App. P. 24(a)(9) ("The argument shall contain the contentions and reasons of the appellant with respect to the issues presented, including the grounds for reviewing any issue not preserved in the trial court, with citations to the authorities, statutes, and parts of the record relied on."). This court is not "a depository in which the appealing party may dump the burden of argument and research." *See State v. Thomas*, 961 P.2d 299, 305 (Utah 1998) (internal quotation marks omitted). When an argument is inadequately briefed, we may refuse to address it. *See id.* at 304. Because TJ has placed the burden of research and analysis squarely on this court, we decline to address this argument.[12]

## II. Admissibility of Father's Statements Under Rules 803(3) and 601(c) of the Utah Rules of Evidence

### A. Affidavit of Stewardship

¶43 TJ contends that Banker's testimony concerning Father's statements when he executed the Affidavit of Stewardship were inadmissible under rule 803(3) of the Utah Rules of Evidence because they were offered for the truth of the matter asserted, not to prove Father's state of mind.[13] *See* Utah R. Evid. 803 (providing that a "statement of the

---

12. Furthermore, this argument is not consistent with the plain language of the Affidavit of Trust, which treats the cash value of Grandfather's insurance policy as a "loan" from the Trust to Todd.

13. The Utah Rules of Evidence were amended effective December 1, 2011. *See generally* Utah R. Evid. 803, 2011 advisory committee note. However, these changes were intended to be "stylistic only." *See id.* Accordingly, we cite the current version of the rules for the convenience of the reader.

declarant's then-existing state of mind" is "not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness"). She further claims that similar statements made by Todd do not fall within the scope of rule 601(c) because the dispute between TJ and her siblings is not an action against the declarant's estate. *See id.* R. 601(c) ("In an action against the declarant's estate, the declarant's statement is admissible notwithstanding the hearsay rule if it was made at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear unless it was made under circumstances indicating its lack of trustworthiness."). However, even if we assume that TJ is correct, she can show no prejudice. *See State v. Clopten*, 2009 UT 84, ¶ 39, 223 P.3d 1103 (explaining that "reversal is not warranted" where the trial court's error is harmless).

¶44    We have affirmed the trial court's determination that the Affidavit of Stewardship was merely cumulative of the Affidavit of Trust's directive that Todd be relieved of any obligation to repay the $250,000 lost in the stock market. *See supra* ¶¶ 34-35. Consequently, we also upheld the trial court's assessment that, even if the Certification had invalidated the Affidavit of Stewardship, it would not change the outcome of the litigation. *See supra* ¶¶ 34-35. Likewise, any presumed error in admitting Banker's and Todd's testimony about statements Father made when he executed the Affidavit of Stewardship is harmless. "Harmless error is defined . . . as an error that is sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings." *Covey v. Covey*, 2003 UT App 380, ¶ 21, 80 P.3d 553 (omission in original) (internal quotation marks omitted). For the same reasons stated in our analysis of the impact of the Certification in a hypothetical new trial, the exclusion of the challenged testimony would not have affected the trial court's decision. If, without that testimony, the trial court had disregarded the Affidavit of Stewardship entirely, Father's decision to relieve Todd of any obligation with respect to the portfolio losses is still reflected in the Affidavit of Trust. Because TJ can show no prejudice, we do not further consider her challenge to the introduction of Father's statements regarding the Affidavit of Stewardship.

B.  Affidavit of Trust

¶45    TJ further argues that the trial court erred by admitting testimony about Father's statements concerning the Affidavit of Trust under rule 601(c). In particular, TJ challenges Friend's testimony about Father's instructions while they were drafting the

document.[14]  However, TJ fails to point us to a place in the record where she preserved this issue for appellate review.  *See* Utah R. App. P. 24(a)(5)(A) (requiring that appellants provide "citation to the record showing that the issue was preserved in the trial court").  Furthermore, our review of Friend's direct testimony during which she reported Father's statements does not reveal a single objection by TJ.  Although TJ did object to a question inquiring about Father's intent during Todd and Tam's redirect examination of Friend, that objection was sustained by the trial court.  Accordingly, TJ failed to preserve this issue for appellate review and we do not consider it.  *See State v. Chavez-Espinoza*, 2008 UT App 191, ¶¶ 7, 9, 186 P.3d 1023 ("An issue is properly preserved in the trial court where the record shows that (1) the issue is raised in a timely fashion; (2) the issue is specifically raised; and (3) the issue is supported by evidence or relevant legal authority." (internal quotation marks omitted)).

### III.  Attorney Fees

¶46    Finally, TJ argues that the trial court failed to award her attorney fees under Utah Code section 75-7-1004(1),[15] which allows the trial court the discretion to award attorney

---

14.  Although the trial court also relied on the testimony of Tam, on appeal TJ does not challenge any of her testimony relating Father's statements.

15.  The statute provides,

> (1) In a judicial proceeding involving the administration of a trust, the court may, as justice and equity may require, award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy.
> (2) If a trustee defends or prosecutes any proceeding in good faith, whether successful or not, the trustee is entitled to receive from the trust the necessary expenses and disbursements, including reasonable attorney's fees, incurred.

*See* Utah Code Ann. § 75-7-1004 (Supp. 2012).

fees "[i]n a judicial proceeding involving the administration of a trust."[16] *See* Utah Code Ann. § 75-7-1004(1) (Supp. 2012).

¶47 When a trial court may, but is not required, to award attorney fees, "it must base its decision on a number of factors." *See Neff v. Neff*, 2011 UT 6, ¶ 70, 247 P.3d 380. "These factors include the language of the contract or statute that forms the basis for the attorney fees award, the number of claims brought by the parties, the importance of each of the claims relative to the entire litigation, and the amounts awarded on each claim." *Id.* In considering these factors, trial courts have "flexibility to handle circumstances where both, or neither, parties may be considered to have prevailed." *See id.* (emphasis and internal quotation marks omitted). "Accordingly, it is possible that, in litigation where both parties obtain mixed results, neither party should be deemed to have prevailed for purposes of awarding attorney fees." *Id.* "The hallmark for determining which party has prevailed is not whether one party has recovered money in an absolute sense, but whether the trial court's decision about who prevailed was based on an approach that was flexible and reasoned." *Id.*

¶48 Here, TJ argues that the "reasons cited by the trial court for its determination" not to award discretionary fees "are severely lacking." Primarily, TJ complains about how the trial court characterized each side's conduct during the course of trial. According to TJ, Todd's and Tam's behavior was considerably worse than hers and weighed in favor of awarding TJ her attorney fees. However, it is not our role to second-guess the trial judge's assessment of the relative fault of the litigants. *See id.* ¶ 71. Instead, we review whether the trial court considered the proper factors and used "common sense" in making its decision. *See id.*

---

16. TJ argues for the first time in her appellate reply brief that the trial court erred in not awarding her fees under subsection 75-7-1004(2). "However, we will not consider matters raised for the first time in the reply brief." *Coleman ex rel. Schefski v. Stevens*, 2000 UT 98, ¶ 9, 17 P.3d 1122. We also do not consider Todd and Tam's claim that the trial court erred by not awarding them attorney fees because they failed to file a cross-appeal. If litigants "wish to attack a judgment of a lower court for the purpose of enlarging their own rights or lessening the rights of their opponent," they must file a cross-appeal. *State v. South*, 924 P.2d 354, 355 (Utah 1996).

¶49    Here, the court noted that "Todd and Tam shifted the estate's cash into a new checking account," which precluded TJ from participating in the Trust's accounting procedures and "created a lack of transparency that cost both sides countless attorney's fees." The court also found that "Todd stole money from the estate's checking account," activity that was aided by excluding TJ from oversight of the Trust's bank account. Additionally, the court considered TJ's concerns that Todd and Tam had lied about the Certification and their failure to account properly for rental property and other income.

¶50    In comparison, the trial court found that "TJ stubbornly fought a losing legal battle regarding the $50,000 from their grandfather's insurance money" and that TJ tried to have Todd repay the $250,000 even though her position was "not substantiated by the evidence." It further questioned TJ's attempt to charge Todd rent for operating a dog kennel on estate property, even though Father had allowed Todd to do so without imposing any rental obligation before his death. The trial court also noted Todd and Tam's contention that TJ "grossly exaggerated" rental income earned from Trust properties.

¶51    After considering all of these factors, the trial court determined that "all three siblings [are] equally responsible for the mayhem they have caused and the attorney's fees they have incurred. The court finds that justice and equity do not require an award of attorney's fees to any of the siblings as against the opposing siblings." Based on the trial court's careful consideration of each party's fault in prolonging the litigation, we cannot conclude that the trial court exceeded its discretion in determining that equity and justice did not require an award of attorney fees to any of the parties. *See* Utah Code Ann. § 75-7-1004 (Supp. 2012).


CONCLUSION

¶52    The trial court did not err in denying TJ's motion for a new trial because the admission of the Certification would not have a reasonable likelihood of resulting in a different result upon a new trial. Moreover, the cash value of Grandfather's insurance policy was never part of the Trust estate, and TJ has not adequately advanced any alternative ground for Father's authority to treat it as a loan from the Trust to Todd.

Any assumed error in admitting Father's statements about the Affidavit of Stewardship were harmless, and TJ did not object to Friend's testimony regarding Father's statements about the Affidavit of Trust.  We also affirm the trial court's decision not to award attorney fees to any of the parties as justice and equity may require because it acted within its discretion after carefully considering the relevant factors.  Finally, the trial court did not exceed its broad discretion in denying TJ's motion for discovery sanctions against Todd and Tam.

¶53     Affirmed.


_____
Carolyn B. McHugh,
Presiding Judge


-----


¶54     WE CONCUR:




_____
J. Frederic Voros Jr.,
Associate Presiding Judge




_____
Michele M. Christiansen, Judge