2014 UT App 156

**Jose Luis AVALOS, Plaintiff and Appellant,**

v.

**TL CUSTOM, LLC, Defendant and Appellee.**

**No. 20120791–CA.**

Court of Appeals of Utah.

July 3, 2014.

Joseph W. Steele and Mark R. Taylor, for Appellant.

J. Angus Edwards, for Appellee.

Senior Judge RUSSELL W. BENCH authored this Opinion, in which Judges GREGORY K. ORME and JAMES Z. DAVIS concurred.[1]

Opinion

BENCH, Senior Judge:

¶1 Jose Luis Avalos appeals from a jury verdict in favor of TL Custom, LLC (TLC). Avalos argues that the trial court exceeded its discretion in admitting evidence that TLC had gone out of business. He also argues that the jury's verdict that TLC was not negligent is not supported by sufficient evidence. We affirm.

## BACKGROUND [2]

¶2 This case arises from a workplace injury that Avalos suffered on October 26, 2007.

---

1. The Honorable Russell W. Bench, Senior Judge, sat by special assignment as authorized by law. *See generally* Utah Code Jud. Admin. R. 11–201(6).

2. "On appeal from a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in the light most favorable to that verdict." *Water & Energy Sys. Tech., Inc. v. Keil*, 2002 UT 32, ¶2, 48 P.3d 888 (citation and internal quotation marks omitted). "We present conflicting evidence only to the extent necessary to understand the issues raised on appeal." *Patey v. Lainhart*, 1999 UT 31, ¶2, 977 P.2d 1193 (citation and internal quotation marks omitted).

While working as an employee for a granite supplier, Avalos delivered a load of granite to TLC, a company engaged in the business of installing granite and tile countertops. While Avalos was helping TLC's employees move an approximately five-by-nine-foot granite slab with a forklift, the forklift caught his foot under its wheel, crushing and tearing the skin from his foot. One of TLC's employees (Operator) was driving the forklift at the time.

¶ 3 In September 2009, Avalos filed a negligence claim against TLC. Prior to trial, Avalos moved to exclude any references to collateral sources of compensation, including workers' compensation, health insurance, and various other governmental and charitable assistance. Avalos argued that TLC should not be permitted to introduce evidence of collateral sources for the purpose of escaping or minimizing its liability. The trial court granted Avalos's motion. Similarly, TLC filed a pretrial motion in limine to exclude any references to its liability insurance on the ground that rule 411 of the Utah Rules of Evidence bars the introduction of evidence of liability insurance in most instances. Avalos's counsel later indicated to the trial court that Avalos had no objection to TLC's motion.

¶ 4 A jury trial was held in April 2012. During opening statements, TLC's counsel made three references to the fact that TLC was no longer in business. In the first instance, TLC's counsel stated,

> You may say, Well, [Operator] has a bias or motive to protect his job or his employer and that's why he's saying that. Well, that's what really happened. But nine months ago [TLC] closed. It's not in business anymore. There's no reason for [Operator] to come in here and tell you anything other than what really happened.

Avalos's counsel did not object to this statement. In the second instance, TLC's counsel explained that the owner of TLC (Owner) has been a countertop installer for fifteen years and "[t]hat's what he's doing now even though [TLC] is closed." TLC's counsel continued to explain that "the economy was so bad people ... weren't remodeling kitchens and [Owner] had to go out of business."

Again, Avalos's counsel did not object. In the third instance, TLC described its expert witness's preparations for trial: "What he did was he went out to [TLC] before they closed down, operated the forklift, ... and he even built a model ... of the granite slabs...." Yet again, Avalos's counsel did not object to TLC's counsel's statement that TLC had closed.

¶ 5 During Avalos's presentation of his case, Operator testified that he was driving the forklift when Avalos was struck. Operator indicated that when using the forklift, he typically would have a ground crew control the granite slab and guide him when the slab was perpendicular to the forklift and blocked his view. Operator testified that on the day of the incident, another TLC employee (Spotter) was helping move the granite slab and holding the left side of the slab. According to Operator, Avalos was on the right side of the forklift, facing away from the forklift and holding the slab with his left hand. Operator testified that he could see Avalos but told Avalos that "he shouldn't be standing that close to the forklift." Avalos heard him and answered that he would be fine. Shortly thereafter, when Operator moved the forklift to the right, Avalos's left foot was caught under the right front wheel of the forklift. Although Operator never lost sight of Avalos, Operator admitted that he could not see Avalos's feet.

¶ 6 Operator also offered testimony regarding his own training and TLC's supervision of him. For example, Operator indicated that TLC did not have anyone supervising the floor at the time of the incident and that he had not read the signs on the forklift or the operating manual for the forklift. On cross-examination, TLC's counsel asked Operator why Operator no longer worked for TLC, and prompted Avalos's first objection regarding TLC's closure:

> [TLC's Counsel: W]hen did you last work at [TLC]?
>
> [Operator:] I believe June or July.
>
> [TLC's Counsel:] And what's the reason you stopped working there?
>
> [Operator:] Ran out of—

[Avalos's Counsel:] Objection, Your Honor. Relevance. What's the relevance whether or not [TLC] is still a—

The Court: I understand relevance. Sustained.

Operator then testified that before working for TLC he had received training on operating forklifts from his previous employer and had driven forklifts daily for four or five years. According to Operator, he did not need a second spotter when moving slabs and had never had a spotter on each side before the incident. Operator also testified that some time after the incident Avalos returned to the shop and told Operator that "it wasn't [Operator's] fault."

¶ 7 Avalos testified that he had been working for the granite supplier for approximately ten months prior to the October 26, 2007 incident and that he made thirty to forty deliveries per week. He also testified that his work involved operating a forklift and working as part of the ground crew. Avalos indicated that he had helped unload slabs at TLC several times with Operator at the wheel of the forklift. Avalos testified that on the day of the incident, no one at TLC told him to stay in the truck or not to help move the slabs. Rather, according to Avalos, Operator told him where he wanted the slabs to go. Avalos testified that as Operator slowly drove the forklift forward he grabbed the slab with his left hand and stood on Operator's right side while Spotter acted as a spotter on Operator's left side. Avalos indicated that the slab was perpendicular to the forklift, blocking Operator's forward view. Avalos further testified that he first became aware that the forklift was moving right when the forklift caught the back of his left foot.

¶ 8 Spotter testified that TLC trained him on the proper loading and unloading of granite slabs and that he had worked at TLC for about a month before the incident[3] Spotter indicated that Avalos helped the TLC employees move a granite slab and that a woman who arrived with Avalos walked along with them. Spotter indicated that he did not tell Avalos not to assist them with moving the slab. According to Spotter, Operator drove the forklift straight, not right, and Avalos was behind Spotter. Spotter testified that Avalos was wearing tennis shoes and was closer to the wheels of the forklift than he should have been. Spotter testified that no one had helped them before from that position. Spotter testified that he noticed Avalos's shoelace was untied because he saw the shoelace go underneath the forklift wheel before Avalos's foot did.

¶ 9 According to Avalos, he did not contribute to the accident. Avalos testified that he was wearing tennis shoes at the time and that his employer did not require him to wear steel-toed boots when working with the granite. Avalos maintained that his shoelaces were tied. Avalos maintained that Operator never told him not to be where he was standing. Avalos denied that he said that the incident was all his fault when he was in the hospital or that he said the incident was not Operator's fault.

¶ 10 Avalos offered testimony from an expert who trains forklift operators. Although Avalos's expert witness did not suggest that the methodology used at TLC was "inherently unsafe," the expert testified that Operator lacked adequate training for his job as a forklift operator at TLC. Avalos's expert explained that spotters are necessary and that forklift operators should have a full body view of any spotters. The expert testified that federal regulations require operators to be trained with the specific piece of equipment used and that TLC did not satisfy that requirement. Avalos's expert further testified that the forklift should generally travel in reverse when carrying a granite slab except when setting the slab down because the slab can obstruct forward visibility when perpendicular to the forklift. Therefore, Avalos's expert opined that Operator should have been moving the forklift in reverse to eliminate the possibility of running over the spotters.

¶ 11 At a sidebar conference held before Owner testified, Avalos's counsel expressed concern that TLC's counsel indicated in opening statements that TLC had gone out of business. Specifically, Avalos argued that

---

**3.** In lieu of live testimony, the transcript of Spotter's deposition testimony was read to the jury.

TLC's closure was not relevant and that it would suggest to the jury that if TLC were held liable, then any damages would come out of Owner's pockets. TLC responded that its closure was important to establish the credibility of Operator and TLC's shop manager (Manager) by showing they were not motivated to protect their employer. The trial court ruled, stating,

I'm going to let you—because you mentioned it in opening statements and I think it is marginally relevant for that purpose, I'm going to let you make the point that they are out of business, but I absolutely will not let you even insinuate and go beyond that. I think [Avalos's counsel has] . . . a legitimate concern.

The trial court also indicated that Owner's testimony about TLC's closure was to be "very . . . circumspect." Avalos's counsel asked the trial court whether it would consider informing the jury that TLC had premises insurance at the time of the incident. The trial court indicated it would not.

¶ 12 On direct examination, the following exchange took place between TLC's counsel and Owner:

Q. Have you—did you own [TLC]?

A. I did.

Q. For how long?

A. Six.

Q. And when did that end?

A. June of last year.

Q. Since June of last year you have not been doing business as [TLC]?

A. Correct.

When asked how long Operator worked for TLC, Owner answered, "[Operator] worked for me for a few years. I laid him off once because of the economy and then brought him back because he was a good employee. And then eventually I had to lay him off again." On cross-examination, Avalos's counsel inquired about Owner's occupation, asking, "[TLC] is out of business. But you're not out of business. You're still going?" Owner answered, "[TLC] is out of business. At one time they had 20 employees, and now it's just me. [TLC], it's just me. I just install . . . countertops." Owner also indicated that TLC would receive deliveries of slabs on an almost daily basis and required its employees working in the shop to wear steel-toed boots. Owner admitted on cross-examination that TLC had written policies concerning internet usage and theft and that TLC could have had a written policy stating that no one could assist TLC employees in moving granite. Owner also admitted that TLC's employment files did not include any safety policies.

¶ 13 Manager testified for the defense. Manager explained TLC's procedures for moving granite slabs and that he would use only one spotter when moving granite slabs because two spotters were "not necessary." Manager testified that TLC employees drove the forklifts in reverse just ten percent of the time because the driver has a better view of the slab and the spotter when moving forward. Manager testified that he trained TLC's employees who served as forklift drivers and spotters. Manager indicated that a spotter should always have a hand on the slab to guide it and should stand at the far end of the slab. Manager explained that when a slab is at a mostly parallel position, a spotter is eleven to twelve feet from the forklift's wheels when standing at the far end of the slab but only about two feet from the wheels when standing at the closer end. Manager stated that it was standard procedure for TLC's employees to handle its equipment and material because a slab was TLC's responsibility once it was removed from the vendor's truck. Manager also testified that he visited Avalos in the hospital on the night of the incident. According to Manager, Avalos said that Operator was not at fault, that Avalos knew that he should not have been in the place where he was at the time of the accident, and that Avalos's training taught him not to stand there. Manager also testified that he saw Avalos three months later and Avalos indicated that the incident was not anyone's fault.

¶ 14 Avalos's employer at the time (Employer) testified as a defense witness. During direct examination, TLC's counsel asked whether Employer's business was still operating, prompting Avalos's objection. The trial court sustained the objection, instructed the jury to disregard Employer's statement

that his business had closed, and admonished TLC's counsel to phrase his question "very carefully." Employer testified that he provided training to Avalos on driving forklifts and acting as a spotter for moving granite slabs. Employer indicated that typically two employees at his business would be involved in moving slabs, "one on the forklift and one stabilizing the material." Employer further indicated that it was not typical for his business to have two spotters. Employer testified that his employees were trained to be spotters at the far end of the slab, as far away as possible from the forklift. Employer indicated that his business did not have a policy stating that Avalos could not help other vendors and that he did not tell Avalos to help as a spotter when delivering slabs. Employer also acknowledged his deposition testimony wherein he stated that Avalos was not paying attention to where he was in relation to the forklift and described how Avalos explained his positioning before the accident.

¶ 15 TLC presented a safety professional as its expert witness. TLC's expert testified that Operator did not violate referenced Occupational Safety and Health regulations in any regard. Furthermore, Operator did not violate applicable manufacturer standards. TLC's expert testified that in the lead up to the incident, Operator did not deviate from how the expert would have trained him to operate the forklift but that Operator should have been more forceful in telling Avalos to step away from the forklift. TLC's expert testified that Avalos, in contrast, put himself in harm's way and did a number of things that contributed to the accident. TLC's expert testified that only one spotter is needed in such situations and that Avalos's presence made it more difficult for Operator, but the expert did acknowledge that it was Operator's responsibility to make sure there was only one spotter. TLC's expert testified that Avalos knew the dangers of his position and had training that he should not have been on the end of the slab closer to the forklift. TLC's expert also testified that Avalos should have been wearing steel-toed footwear.

¶ 16 During the course of the trial, the court permitted the jurors to submit questions for witnesses. Some of the jurors' questions pertained to insurance and collateral sources of compensation. For instance, one juror asked, "Did [TLC] have liability insurance and was it active at this time[?] If so what were the liability limits[?]" Another asked if Avalos was covered by workers' compensation insurance. Similarly, another juror asked why this case was not a workers' compensation claim, and another inquired about whether Avalos had health insurance to cover costs. Because these subject areas had been excluded, the trial court did not pose any of these questions to the witnesses.

¶ 17 Avalos requested that the trial court issue a curative instruction pertaining to TLC's ability to satisfy a judgment. Avalos maintained that TLC's business status was not relevant under rule 401 of the Utah Rules of Evidence, but because TLC had introduced that evidence, Avalos argued that the proper remedy would be to inform the jury that TLC was closed but had ample assets available to satisfy a judgment. Avalos also argued that TLC had opened the door to evidence of its liability insurance. Specifically, Avalos proposed the following instruction:

> You must not consider whether any of the parties in this case has insurance. The presence or absence of insurance is totally irrelevant. Likewise, the continuation of the Defendant's business is totally irrelevant. The fact that Defendant claims to be out of business is irrelevant to your verdict. You must decide this case based only on the law and the evidence, and not on any sympathy to either party.

However, the trial court chose to issue a different instruction (Instruction 20), which stated,

> Your responsibility [in] this case is to determine liability and damages. The potential or actual source of payment for any damages is not part of that analysis. Ability to pay or the possibility of a source for payment of the damages must not play any part in your determination of liability and total damages. You must decide this case based only on the law and evidence, and not on sympathy to either party.

¶ 18 When the case was submitted to the jury, the special verdict form asked the jury, "Was [TLC] negligent as alleged by Mr. Avalos?" The jury answered, "No." Accordingly, the trial court entered judgment in favor of TLC. Avalos filed a motion for a new trial, arguing that the jury's verdict was not supported by sufficient evidence and that the trial court erred by preventing him from introducing evidence of TLC's liability insurance to cure the express impression given by TLC that it had no ability to satisfy a judgment. The trial court denied Avalos's motion. Avalos now appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 19 First, Avalos challenges the trial court's admission of evidence that TLC had gone out of business since the incident.[4] The trial court has broad discretion to admit or exclude evidence, and we "will disturb its ruling only for abuse of discretion." *Daines v. Vincent*, 2008 UT 51, ¶ 21, 190 P.3d 1269. "[W]e will not reverse a trial court's ruling on evidence unless the ruling was beyond the limits of reasonability." *Id.* (citation and internal quotation marks omitted). Even when evidence is improperly admitted, reversal is required only where the admission of the evidence amounted to prejudicial error. *Larsen v. Johnson*, 958 P.2d 953, 958 (Utah Ct.App.1998); *see also* Utah R. Civ. P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").

¶ 20 Second, Avalos challenges the sufficiency of the evidence in support of the jury's verdict that TLC was not negligent. "In reviewing a jury verdict, we view the evidence in the light most supportive of the verdict[ ] and assume that the jury believed those aspects of the evidence which sustain its findings and judgment." *Stevensen 3rd E., LC v. Watts*, 2009 UT App 137, ¶ 26, 210 P.3d 977 (alteration in original) (citation and internal quotation marks omitted). "As a result, we will upset a jury verdict only upon

a showing that the evidence so clearly preponderates in favor of the appellant that reasonable people would not differ on the outcome of the case." *Id.* (citation and internal quotation marks omitted).

## ANALYSIS

### I. Admission of Evidence of TLC's Closure

¶ 21 Avalos first argues that the trial court exceeded its discretion in admitting evidence that TLC had gone out of business. Avalos argues that this evidence was inadmissible and prejudicial because it permitted the jury to infer that TLC would be incapable of paying any damages. This issue was first introduced into the trial when TLC's counsel made three references to TLC's closure during opening statements. Although Avalos did not object at that time, the trial court sustained his objection to the relevance of the evidence when TLC's counsel asked Operator on cross-examination why Operator no longer worked for TLC. When the issue was raised again before Owner testified, the trial court ruled that TLC could "make the point that [TLC is] out of business" because TLC mentioned it in opening statements and because it was "marginally relevant for [the] purpose" of establishing the credibility of Operator and Manager, who were both former employees of TLC. The trial court then cautioned TLC to be "circumspect" and not to "go beyond that." As a result of the trial court's ruling, Owner testified that TLC had closed since the time of Avalos's injury.

¶ 22 We begin our analysis by acknowledging that the trial court's pretrial evidentiary rulings limited the ability of both parties to introduce evidence of any compensation that Avalos had received or might be awarded. In particular, the trial court restricted TLC from referring to collateral sources that may have compensated Avalos, including workers' compensation, health insurance, and other sources of assistance. *See generally Wilson v. IHC Hosps., Inc.*, 2012 UT 43, ¶ 31, 289 P.3d 369 (indicating that "[u]nder the common

---

**4.** Avalos also argues that the trial court should have permitted him to introduce evidence of TLC's liability insurance in response to the asserted improper admission of TLC's business sta-

tus. Given our resolution of this appeal and our conclusion that any assumed error in the admission of TLC's closure was harmless, we need not address this argument. *See infra* ¶¶ 26–28.

law collateral source rule, 'a wrongdoer is not entitled to have damages, for which he is liable, reduced by proof that the plaintiff has received or will receive compensation or indemnity for the loss from an independent collateral source'" (quoting *Mahana v. Onyx Acceptance Corp.*, 2004 UT 59, ¶ 37, 96 P.3d 893)). In turn, Avalos was restricted from referring to whether TLC had liability insurance. *See generally* Utah R. Evid. 411 ("Evidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently" but this evidence may be admissible for other purposes). Our review of the record indicates that the trial court consistently adhered to these rulings.

¶ 23 On appeal, Avalos argues that the evidence of TLC's closure was irrelevant and prejudicial because it "elicit[ed] sympathy from the jurors" by "implying that any adverse judgment would fall solely on [Owner]." TLC, in contrast, maintains that the evidence was relevant and properly admitted for the "legitimate purpose" of showing that "Avalos had less credibility than TLC's former employees" because the former employees had no motive to protect TLC. In response to this argument, Avalos contends that the evidence was improper rebuttal evidence and witness bolstering because he had not attacked the credibility of TLC's former employees prior to its admission.

■■■ ¶ 24 Even if we assume that the trial court exceeded its discretion in admitting the evidence of TLC's closure, Avalos has the burden to show that the error was "substantial and prejudicial in that [he] was deprived in some manner of a full and fair consideration of the disputed issues by the jury." *Ashton v. Ashton*, 733 P.2d 147, 154 (Utah 1987); *see also Stevenett v. Wal–Mart Stores, Inc.*, 1999 UT App 80, ¶ 8, 977 P.2d 508 ("[T]he person asserting error has the burden to show not only that error occurred but also that it was substantial and prejudicial."). Indeed, "reversal is not warranted where the trial court's error is harmless." *Hull v. Wilcock (In re Estate of Wilcock)*, 2012 UT App 223, ¶ 43, 285 P.3d 815 (citation and internal quotation marks omitted). " 'Harmless error is defined ... as an error

that is sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings.' " *Id.* ¶ 44 (omission in original) (quoting *Covey v. Covey*, 2003 UT App 380, ¶ 21, 80 P.3d 553). "[I]n other words, an error is harmful only if the likelihood of a different outcome is sufficiently high as to undermine our confidence in the verdict." *Covey*, 2003 UT App 380, ¶ 21, 80 P.3d 553 (citation and internal quotation marks omitted). In evaluating whether an error is prejudicial, we consider the totality of the evidence and proceedings. *See Steffensen v. Smith's Mgmt. Corp.*, 820 P.2d 482, 489 (Utah Ct.App.1991), *aff'd*, 862 P.2d 1342 (Utah 1993); *see also Kelson v. Salt Lake Cnty.*, 784 P.2d 1152, 1157 (Utah 1989) (indicating that in analyzing whether an error is prejudicial, "we must consider the impact of that error in the context of the whole proceeding").

■■■ ¶ 25 In some instances, jury instructions may cure any error resulting from the improper admission of certain evidence. *See Wilson*, 2012 UT 43, ¶ 54, 289 P.3d 369. For example, the Utah Supreme Court addressed similar circumstances in *Child v. Gonda*, 972 P.2d 425 (Utah 1998). In *Child*, the plaintiff's daughter was a passenger in her friend's car when she was killed in a two-vehicle collision. *Id.* at 427. The plaintiff subsequently settled with the daughter's friend and sued the driver of the second vehicle. *Id.* Before trial, the trial court ruled that the jury was entitled to know that the plaintiff and his daughter's friend had " 'resolved their differences' " but that counsel could not mention anything about the settlement. *Id.* at 428. Nevertheless, the second driver's counsel suggested during opening statements that the plaintiff was suing the second driver to " 'get paid some more money.' " *Id.* The jury returned a verdict finding that the second driver was not negligent. *Id.* On appeal, the plaintiff argued that he was entitled to a new trial because counsel's remark constituted an irregularity in the proceedings. *Id.* at 429. Although our supreme court agreed with the plaintiff that counsel's remark violated the trial court's pretrial order, the court concluded that the plaintiff

"failed to present any compelling arguments . . . that the offending remark denied him a fair trial." *Id.* at 430. In support of its conclusion, the supreme court cited an instruction given to the jury at the conclusion of the evidence. *Id.* at 430 & n. 5. That instruction provided, in relevant part,

> In your deliberation in this case, you are not to concern yourself with the question of whether [the plaintiff] received funds from any source in connection with the role that [his daughter's friend] played in the collision in question. Your sole job is to concern yourself with the questions involving responsibility for the collision and the resultant death of [the plaintiff's daughter], and the amount of the damages suffered by [the plaintiff] as a result of his daughter's death.

*Id.* at 430 n. 5. Ultimately, the supreme court was not persuaded by the plaintiff's argument that this instruction did not cure the misconduct and therefore affirmed the jury's verdict. *Id.* at 430.

¶ 26 In our case, the trial court permitted limited evidence that TLC had gone out of business. To the extent the jury could have inferred from this evidence that TLC would not have been able to satisfy any adverse judgment, the jury instructions effectively mitigated against that possibility. Specifically, the trial court instructed the jury in Instruction 20 that TLC's potential ability to pay for damages could not play any part in the jury's determinations:

> Your responsibility [in] this case is to determine liability and damages. The potential or actual source of payment for any damages is not part of that analysis. Ability to pay or the possibility of a source for payment of the damages must not play any part in your determination of liability and total damages. You must decide this case based only on the law and evidence, and not on sympathy to either party.

We presume that the jury followed this instruction. *See Tooele Assocs. Ltd. P'ship v. Tooele City*, 2012 UT App 214, ¶ 11, 284 P.3d 709; *Ortiz v. Geneva Rock Prods., Inc.*, 939 P.2d 1213, 1216 (Utah Ct.App.1997) ("In the absence of the appearance of something persuasive to the contrary, we assume that the jurors were conscientious in performing to their duty, and that they followed the instructions of the court." (citation and internal quotation marks omitted)).

¶ 27 Nevertheless, Avalos argues that Instruction 20 did not cure the harm from the evidence of TLC's closure because it was given at the end of trial and because it was "vague[ ]" and did not explicitly direct the jurors to disregard evidence that TLC had gone out of business. However, we are not persuaded that the timing of Instruction 20 inhibited its efficacy. *See Child*, 972 P.2d at 429–30 (rejecting the argument that a jury instruction given at the close of evidence was not sufficient to cure misconduct that occurred in opening statements). Moreover, the import of Instruction 20 is clear; the plain language of this instruction informed the jury that the "[a]bility to pay or the possibility of a source for payment of the damages must not play any part in [its] determination of liability and total damages." Accordingly, the jury was effectively instructed that it should not consider evidence of TLC's closure and any resulting implication regarding TLC's ability to pay.

¶ 28 In light of the limited nature of the evidence pertaining to TLC's closure and the instruction given to the jurors that they could not consider any source of payment, we are not convinced that the exclusion of the evidence of TLC's closure would have resulted in a more favorable verdict for Avalos. We therefore conclude that any assumed error in admitting this evidence was not prejudicial to Avalos.

## II. Sufficiency of the Evidence That TLC Was Not Negligent

¶ 29 Next, Avalos contends that there is insufficient evidence to support the jury's verdict that TLC was not negligent. "In reviewing a jury verdict, we view the evidence in the light most supportive of the verdict, and assume that the jury believed those aspects of the evidence which sustain its findings and judgment." *Proctor v. Costco Wholesale Corp.*, 2013 UT App 226, ¶ 24, 311 P.3d 564 (citation and internal quotation marks omitted). As the party challenging the verdict, Avalos "must carry the heavy

burden of establishing that the evidence so clearly preponderates in [his] favor ... that reasonable people would not differ on concluding that [TLC] was negligent." *See id.* (omission and first alteration in original) (citation and internal quotation marks omitted); *see also Stevensen 3rd E., LC v. Watts,* 2009 UT App 137, ¶ 49, 210 P.3d 977 ("The burden on an appellant to establish that the evidence does not support the jury's verdict and the factual findings implicit in that verdict ... is quite heavy." (citation and internal quotation marks omitted)). In undertaking our review, we bear in mind that "[i]t is the exclusive function of the jury to weigh the evidence and to determine the credibility of the witnesses." *Child,* 972 P.2d at 433 (alteration in original) (citation and internal quotation marks omitted). Thus, "[t]he existence of conflicting evidence, alone, does not justify overturning a verdict for insufficient evidence," *Stevensen 3rd E.,* 2009 UT App 137, ¶ 49, 210 P.3d 977 (citation and internal quotation marks omitted), and "[s]o long as some evidence and reasonable inferences support the jury's findings, we will not disturb them," *Child,* 972 P.2d at 433.

¶ 30 In support of his contention that the evidence is insufficient to support the jury's verdict, Avalos concedes that "[t]he evidence may support a finding that Mr. Avalos contributed, in part, to his own injuries," but he asserts that the evidence does not "negate the uncontested evidence [he] presented regarding [TLC's] negligence." In particular, Avalos argues that there was uncontested evidence that conclusively established at least some negligence, including evidence (1) that Operator should have been more forceful in telling Avalos to move away from the forklift, (2) that Operator had an unobstructed view of Avalos and turned the forklift toward him, running over his foot, (3) that TLC's employees had not read the forklift's operating manual, and (4) that TLC violated federal safety regulations in its training of drivers and in its operation of the forklift. We disagree.

¶ 31 "The standard upon which negligence is gauged is that of ordinary, reasonable care under the circumstances, which standard it is peculiarly fitting that juries determine." *Canfield v. Albertsons, Inc.,* 841 P.2d 1224, 1227 (Utah Ct.App.1992) (citation and internal quotation marks omitted). The jury was instructed that "[n]egligence means that a person did not use reasonable care," which is "simply what a reasonably careful person would do in a similar situation." Accordingly, the jury's verdict indicates that the jury determined that TLC did exercise reasonable care under the circumstances.

¶ 32 Contrary to Avalos's assertion, the evidence that Avalos relies on does not necessarily establish that TLC was negligent. First, the evidence that Operator should have been more assertive when warning Avalos not to stand so close to the forklift does not prove that TLC failed to exercise reasonable care. Although TLC's expert testified that Operator erred by not demanding that Avalos step away from the forklift, TLC's expert also testified that Operator acted in accordance with how the expert would have trained him. In addition, the jury's apparent conclusion that Operator's actions were reasonable is supported by Operator's testimony that Avalos heard the warning and that Avalos responded by stating he would be fine. *See generally Proctor,* 2013 UT App 226, ¶ 24, 311 P.3d 564 (indicating that we "assume that the jury believed those aspects of the evidence which sustain its findings and judgment" (citation and internal quotation marks omitted)).

¶ 33 Second, and for the same reasons, TLC's alleged negligence was not established by Operator's testimony that Operator had a clear view of Avalos, turned the forklift toward him, and ran over his foot. TLC's expert's testimony supports the conclusion that even though Avalos was injured, TLC and its employees did not operate the forklift in a manner contrary to protocol.

¶ 34 Third, TLC's alleged lack of reasonable care was not established by the evidence that its employees had not read the forklift's operating manual. Rather, other evidence supports the jury's apparent conclusion that this failure was not unreasonable. Specifically, TLC's expert testified that, despite this oversight, TLC's employees had adequate training and experience with the forklift. Although there was conflicting evidence in this

regard, it was the jury's role to weigh that evidence. *Child v. Gonda*, 972 P.2d 425, 433 (Utah 1998).

¶ 35 Fourth, the evidence that TLC violated federal safety regulations did not establish TLC's alleged negligence because there was evidence to the contrary. *See Stevensen 3rd E., LC v. Watts*, 2009 UT App 137, ¶ 49, 210 P.3d 977. In particular, there was testimony that TLC did not violate the regulations and that TLC's employees did not do anything that would have been proscribed by the regulations. Moreover, even if the jury believed Avalos's evidence that TLC did violate federal safety regulations, the jury evidently concluded that TLC's failure was not unreasonable under the circumstances. *Cf. Ames v. Maas*, 846 P.2d 468, 475 (Utah Ct. App.1993) ("This court has held that the violation of a statute is evidence of negligence but subject to justification or excuse if the evidence is such that it reasonably could be found that the conduct was nevertheless within the standard of reasonable care under the circumstances."). Viewing the evidence in the light most favorable to the verdict, we conclude that there is evidence to support the jury's finding of no negligence on the part of TLC.[5]

¶ 36 In sum, Avalos has not persuaded us that the evidence in this case clearly preponderates in his favor. Accordingly, Avalos's insufficiency claim fails because sufficient evidence was introduced at trial to support the jury's conclusion that TLC exercised reasonable care under the circumstances.

## CONCLUSION

¶ 37 We conclude that any error in the admission of TLC's closure was harmless because the evidence of the closure was limited and the jury was instructed that TLC's ability to pay for any damages could not play any role in its determinations. We also conclude that there was sufficient evidence to support the jury's verdict that TLC was not negligent. We therefore affirm.

---

5. In addition, we observe that in order to recover anything, Avalos had to establish that TLC's negligence exceeded his own. *See* Utah Code Ann. § 78B–5–818(2) (LexisNexis 2012) ("A person seeking recovery may recover from any defendant ... whose fault ... exceeds the fault of the person seeking recovery...."). In other words, Avalos could not recover on his negligence claim if the evidence did not compel a finding that TLC was more than fifty percent at fault. Because the evidence is sufficient to support the jury's finding of no negligence, the evidence here clearly does not dictate a finding that TLC was more than fifty percent at fault.