**2015 UT App 280**

## THE UTAH COURT OF APPEALS

SINDA LYNN KERBY AND ELLESA E. DAY,
Appellants,
*v.*
MOAB VALLEY HEALTHCARE, INC.,
Appellee.

Opinion
No. 20131172-CA
Filed November 19, 2015

Seventh District Court, Moab Department
The Honorable Lyle R. Anderson
No. 090700112

Robert D. Strieper, Attorney for Appellants

Robert L. Janicki and Michael L. Ford, Attorneys for
Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES JOHN A. PEARCE and KATE A. TOOMEY concurred.

ORME, Judge:

¶1     A patient died following a medical procedure performed at Allen Memorial Hospital in Moab. Her daughter and her mother (Plaintiffs) filed suit against Moab Valley Healthcare, Inc. (Allen Memorial), which operated Allen Memorial Hospital, for medical malpractice. Plaintiffs filed a motion for partial summary judgment and what they characterized as a renewed motion for partial summary judgment on the issue of causation, both of which the trial court denied. Following trial, the jury found that nurses employed by Allen Memorial breached the standard of care by discharging the patient while she was still under the influence of drugs that she had received during her hospitalization but that the breach did not cause her death. Plaintiffs appeal.

¶2      Plaintiffs contend that the trial court erroneously denied their motions for partial summary judgment and that the court erroneously permitted prejudicial evidence regarding the incarceration of the patient's son. We affirm.

BACKGROUND

¶3      In 2007, the patient underwent an esophagoscopy and a bronchoscopy at Allen Memorial Hospital in Moab, Utah. During the procedure, a doctor removed a "fair amount" of mucus from her lungs. Afterward, during her three-hour stay at Allen Memorial Hospital, the patient received 30 mg of morphine, 25 mg of Valium, 4 mg of Zofran, 2 mg of Dilaudid, 5 mg of Versed, 50 mg of fentanyl, and, just before she was wheeled out to her car, 12.5 mg of promethazine. When the patient was discharged, several nurses observed that she was drowsy, unable to understand instructions, and acting drunk and incoherent. One of the nurses later testified that she had to remind the patient several times to take deep breaths.

¶4      The patient's ex-husband drove her to her home from the hospital and helped her to bed. The last time anyone saw the patient alive was when her daughter went into the patient's bedroom around 11:00 p.m. that night. Around 4:00 a.m., the patient's ex-husband found her dead. The medical examiner determined her cause of death to be the "combined effects of asthma, chronic bronchitis, drug toxicity (morphine and promethazine) and obesity."

¶5      In 2009, Plaintiffs filed a complaint against Allen Memorial alleging medical malpractice for the wrongful death of the patient. Thereafter, Plaintiffs filed a motion for partial summary judgment on the issue of causation. Plaintiffs contended that the nurses at Allen Memorial Hospital "breached the standard of care by discharging a pharmaceutically inebriated patient . . . from same day surgery prematurely and

that she should have been admitted for overnight observation." They further contended that "if [the patient] had not been discharged from Allen Memorial and had been fully recovered from her anesthesia before she was discharged, she would not have died." In support of their motion, Plaintiffs relied on the deposition testimony of Allen Memorial's causation expert, a toxicologist, who testified at one point during his deposition that although it was outside the scope of his expertise, "being a physician, [he] would generally have to answer that it's more likely that [the patient] would have survived in the hospital."

¶6    The trial court denied Plaintiffs' first motion for partial summary judgment. During a hearing on the motion, there was some discussion by Plaintiffs' counsel regarding the "astronomical" level of promethazine recorded on the autopsy report, which "could not be accounted for by the one dose charted in [the patient's] record." Allen Memorial's counsel observed that Plaintiffs' motion was "a hundred percent focused" on whether the patient received too much promethazine and that the issue was not whether the promethazine caused her death but, as the trial court put it, "whether, if she hadn't been discharged, she would have survived." The trial court considered whether Plaintiffs were confusing but-for causation with proximate cause and observed that the issue was "whether the hospital should have foreseen that their discharging [the patient] would have caused this result." The court ultimately denied Plaintiffs' motion, the judge stating, "I don't think someone overdosing by medication they get by extra-legal means is something that the hospital can foresee. There may be some other reasons, but I should deny the motion on that ground alone. So, I'm denying that motion for partial summary judgment."[1]

---

1. During the same hearing, the trial court addressed Plaintiffs' motion to strike Allen Memorial's attempt to allocate fault to

(continued…)

¶7    Subsequently, the parties took an additional deposition to help them understand the discrepancy between the amounts of promethazine recorded in the patient's medical record and in her autopsy report. Based on that deposition, Plaintiffs filed their renewed motion for summary judgment on the issue of causation. At a hearing on that motion, the following colloquy ensued:

> [Trial court]: Even the stuff you cited, the guy said, I don't know. Obviously, she would have been more likely to have lived, but more likely doesn't mean it makes a difference between living and not living. So, where do you have evidence that I must determine, as a matter of law, that had she stayed in the hospital, she wouldn't have died?
>
> [Plaintiffs' counsel]: Because she would have been able to be monitored. She would have been kept alive and the evidence is—I mean, even though he says she may have, more likely than not, that's the standard.

---

(…continued)
Plaintiffs based on the high level of promethazine recorded on the autopsy report. There was only one 12.5 mg dose of promethazine recorded in the patient's medical record, which could not account for the high level of promethazine found in her blood stream during her autopsy. Plaintiffs contended that the patient had access to promethazine only at Allen Memorial Hospital and that the hospital must have given her more promethazine than it recorded in her chart. Allen Memorial contended that the patient somehow acquired and self-administered promethazine after she was discharged from the hospital. The trial court concluded that the question of where the patient received or obtained the promethazine was a jury issue.

> [Trial court]: He didn't say that. He said she was more likely to live being in the hospital than not being in the hospital. So, maybe, the chances go up from five to ten, from ten to twenty, maybe they go from forty-five to fifty-five. I don't know and he didn't know.

The court then denied Plaintiffs' renewed motion for partial summary judgment on the ground that material facts were in dispute.

¶8    Additionally, before trial, the patient's son, who had been incarcerated during the last years of her life, disclaimed any interest in the case and any right to claim proceeds from the case. As a result, on the first day of trial, Plaintiffs asked the trial court to disallow any mention of the son because "any discussion about [him] would be prejudicial, a waste of time, a waste of judicial resources and his relationship with [the patient] is not at issue in this case." The trial court denied Plaintiffs' request, stating that the son was

> one of the heirs and the difference between heirs, under the Probate Code, and heirs under the personal injury code is something I learned about early in my career. . . . I don't think you can carve one person out of a family, as a matter of law, just because he doesn't want anything and determine that anything about his relationship is completely irrelevant to the evaluation of all of the other relationships that exist in the family.

Thereafter, during the trial, one of the patient's daughters testified that the patient never visited the son while he was in prison.

¶9    The jury determined that Allen Memorial breached the standard of care but that the breach did not cause the patient's

death. As a result, the jury awarded nothing to Plaintiffs, and they now appeal.

ISSUES AND STANDARDS OF REVIEW

¶10    First, Plaintiffs contend that the trial court erroneously denied their motion for partial summary judgment and their renewed motion for partial summary judgment. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). We "review[] a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness and view[] the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Bingham v. Roosevelt City Corp.*, 2010 UT 37, ¶ 10, 235 P.3d 730 (citation and internal quotation marks omitted).

¶11    Second, Plaintiffs contend that the trial court erroneously permitted "irrelevant and unfairly prejudicial" evidence of the son's incarceration in violation of rule 403 of the Utah Rules of Evidence. "We review a trial court's decision to admit or exclude evidence under Rule 403 of the Utah Rules of Evidence under an abuse of discretion standard, and will not overturn a lower court's determination of admissibility unless it is beyond the limits of reasonability." *Diversified Holdings, LC v. Turner*, 2002 UT 129, ¶ 6, 63 P.3d 686 (citation and internal quotation marks omitted). "Additionally, '[e]ven if the evidence was erroneously admitted, that fact alone is insufficient to set aside a verdict unless it has had a substantial influence in bringing about the verdict.'" *Glacier Land Co. v. Claudia Klawe & Assocs.*, 2006 UT App 516, ¶ 12, 154 P.3d 852 (alteration in original) (quoting *State v. Bluff*, 2002 UT 66, ¶ 47, 52 P.3d 1210). *See also* Utah R. Evid. 103(a) (providing that an erroneous ruling requires reversal "only if the error affects a substantial right of the party" claiming error).

ANALYSIS

I. Motions for Summary Judgment on Causation

¶12    Plaintiffs argue that the trial court erred when it denied their motions for partial summary judgment on the question of causation. According to Plaintiffs, "[t]he issue regarding causation should never have gone to the jury" because "[t]he issue regarding causation and whether or not [the patient] would have survived on June 20, 2007 if she had been admitted to Allen Memorial Hospital was undisputed."[2] Plaintiffs contend that "[t]here was absolutely no evidence presented that if [the patient] had been hospitalized she would have died or that she would more likely than not have died."[3]

¶13    "To sustain a medical malpractice action, a plaintiff must demonstrate '(1) the standard of care by which the [medical professional's] conduct is to be measured, (2) breach of that

_____

2. In their briefing, Plaintiffs repeatedly assert that it was also undisputed that the patient died from the "combined effects of asthma, chronic bronchitis, drug toxicity (morphine and promethazine) and obesity." However, Plaintiffs concede that "[t]he standard of care [they] alleged was breached was not that [the patient] received too many medications or that she should not have received the medications, but that she should not have been discharged from the hospital." Thus, according to Plaintiffs, "although it is informative to know what the process of her death was, the real issue on causation was whether or not [the patient] would have lived if she had been admitted to the hospital."

3. We note that the relevant inquiry was not whether the patient would have *died* if she had been kept in the hospital but whether she would have *lived* if she had been kept in the hospital, as Plaintiffs contend she should have been.

standard by the [professional], (3) injury that was proximately caused by the [professional's] negligence, and (4) damages.'" *Sohm v. Dixie Eye Ctr.*, 2007 UT App 235, ¶ 15, 166 P.3d 614 (alterations in original) (quoting *Jensen v. IHC Hosps., Inc.*, 2003 UT 51, ¶ 96, 82 P.3d 1076). As to the third element of a medical malpractice claim, "[p]roximate cause is '[t]hat cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the result would not have occurred.'" *Harline v. Barker*, 854 P.2d 595, 600 (Utah Ct. App. 1993) (second alteration in original) (quoting *Butterfield v. Okubo*, 831 P.2d 97, 106 (Utah 1992)). In a medical malpractice case, "the plaintiff is required to prove the standard of care and proximate cause through expert testimony." *Sohm*, 2007 UT App 235, ¶ 15.

¶14    "Generally, causation cannot be resolved as a matter of law" because it is a "highly fact-sensitive element of any cause of action." *Kilpatrick v. Wiley, Rein & Fielding*, 909 P.2d 1283, 1292 (Utah Ct. App. 1996) (citation and internal quotation marks omitted). *See also Harline*, 854 P.2d at 600 ("Proximate cause is an issue of fact."). Indeed, Utah courts have recognized that "[f]act-sensitive cases . . . do not lend themselves to a determination on summary judgment." *Draper City v. Estate of Bernardo*, 888 P.2d 1097, 1101 (Utah 1995). On the other hand, Utah courts have also recognized that "in appropriate circumstances summary judgment may be granted on the issue of proximate cause," *Jensen v. Mountain States Tel. & Tel. Co.*, 611 P.2d 363, 365 (Utah 1980), "[w]here, for instance, reasonable minds could not differ that something was or was not the proximate cause of injury," *see id.* at 365 n.4. In any event, "Utah litigants do not easily dispose of the element of causation on summary judgment." *Kilpatrick*, 909 P.2d at 1292.

¶15    In this case, Plaintiffs argue that the trial court erred in denying their motions for partial summary judgment because, according to Plaintiffs, there was no genuine dispute of material fact regarding causation in view of the deposition testimony of

Allen Memorial's causation expert, a toxicologist. Relying on the toxicologist's testimony, Plaintiffs contend that "[i]t was undisputed that had [the patient] stayed the night at Allen Memorial Hospital she would more likely than not have lived."

¶16   During his deposition, the toxicologist answered several questions from Plaintiffs' counsel regarding whether the patient would have fared better if she had stayed at Allen Memorial Hospital after her procedure rather than going home. Because the overall tone of the testimony and the context of key statements are of such importance, we quote the testimony at length:

> Q. Okay. Do you agree with this, if [the patient] had been kept overnight at Allen Memorial Hospital on June 20th, 2007, in your opinion do you believe, more likely than not, that she would have been alive on June 21st 2007?
>
> . . . .
>
> A. I don't feel—that's beyond my level of expertise. I don't feel like I can adequately answer that.
>
> . . . .
>
> Q. And so she stood a much better chance of surviving this if she had been kept in the hospital, correct?
>
> A. I don't know the answer to that.
>
> Q. Why don't you know the answer to that when you—
>
> A. Because I don't know that she died from the promethazine. She could have had a cardiac

arrhythmia, which may or may not have been treatable in the hospital, may have been.

. . . .

Q. Okay. So—but the respiratory arrest is more likely than not, correct; that's what you said earlier?

A. I said it's more likely than a cardiac arrhythmia, and it's more likely than—it's likely that it was a respiratory death.

Q. Yes. It's likely that it was a respiratory death, and a respiratory death can be prevented in the hospitals, correct?

A. Most of the time. Not always, but most of the time, yes.

Q. And if it was a respiratory death, if she had been monitored, would she not have, more likely than not, survived the respiratory arrest in the hospital?

. . . .

A. It's beyond my level of expertise, but it is possible that she would have survived, yes.

Q. Is it possible or even probable?

. . . .

A. Again, it's speculative. All respiratory arrests that occur in the hospital are not—those patients don't always survive, so I don't know the

percentages of whether she would have survived or not.

Q. Would she more likely have survived in the hospital if she had a respiratory arrest than if she was at home having a respiratory arrest?

A. Yes.

Q. How much more likely?

A. I don't know. I can't quantitate. I don't know the percentages, the numbers.

Subsequently, after several additional questions, Plaintiffs' counsel questioned the toxicologist one final time regarding the patient's chances of survival at the hospital as compared to her being at home:

Q. If [the patient] was in the hospital, monitored, and being observed through the night, at that point would she stand a better chance of surviving her respiratory arrest in the hospital than being at home unmonitored?

. . . .

A. It is outside the scope of my expertise, but, being a physician, I would generally have to answer that it's more likely that she would have survived in the hospital.

Q. If she was in the hospital at Allen Memorial, monitored and watched overnight, would you say that she, more likely than not, would not have died on June 20th, 2007, or June 21st, 2007?

. . . .

A. . . . I'm sorry. . . . I can't answer that.

Q. Even as a physician, knowing what she died from—

A. Not actually certain what she died from. She died from multiple causes, so I don't feel that I can answer that.

¶17    Plaintiffs contend that the toxicologist's testimony that "being a physician, I would generally have to answer that it's more likely that she would have survived in the hospital" was sufficient to establish causation and that, therefore, the trial court should have granted their motions for partial summary judgment.[4] And at oral argument before this court, Plaintiffs' counsel relied heavily on the argument that although the toxicologist originally qualified his testimony by stating that it was outside the scope of his expertise, he provided this particular testimony based on his knowledge generally as a physician, and thus, without qualification.

¶18    Plaintiffs' characterization of the record is flawed. The toxicologist began this particular statement by stating that it was "outside the scope of [his] expertise." But in any event, we conclude that the toxicologist's testimony, as a whole, was insufficient to establish causation as a matter of law. Both before and after this statement, the toxicologist either qualified his answers to trial counsel's questions on causation as being outside the scope of his expertise or indicated that he did not know the answer to, or could not answer, trial counsel's questions. Indeed, for the majority of his testimony, the

---

4. As a general proposition, we note that it is rather unusual that Plaintiffs would try to prevail on summary judgment based primarily on the testimony of the *defendant's* expert witness.

toxicologist was rather adamant that the answers trial counsel sought were outside the scope of his expertise.

¶19 Thus we cannot agree that the toxicologist changed his view about the limitations presented by his credentials during the course of his testimony. Therfore, we conclude that once the toxicologist qualified his testimony by stating that it was outside the scope of his expertise, the trial court was effectively entitled to disregard any and all of the toxicologist's subsequently expressed opinions regarding causation. Given the qualified manner in which the toxicologist gave his deposition testimony, there was no definitive evidence establishing causation, i.e., that the patient would have more likely survived if she had not been discharged from the hospital even though the toxicologist acknowledged the general accuracy of the proposition— seemingly inarguable—that patients with significant respiratory problems do better in hospitals than at home. Accordingly, the trial court did not err when it denied Plaintiffs' motions for partial summary judgment.

## II. Evidence of Incarceration

¶20 Plaintiffs argue that the trial court erred in allowing testimony regarding the son's incarceration because it was unfairly prejudicial, in violation of rule 403 of the Utah Rules of Evidence. The son was incarcerated when the patient died, and before trial he had "disclaimed and waived any rights to any settlement or any type of recovery at all in the wrongful death case of his mother."

¶21 On the first day of trial, Plaintiffs moved the trial court to disallow any mention of the son because "any discussion about [him] would be prejudicial, a waste of time, a waste of judicial resources and his relationship with [the patient] is not at issue in this case." Allen Memorial argued that "[the patient]'s relationship with her children is what this case is about and her relation[ship] with one of her children . . . has an impact on the

relationship with all of her children." Allen Memorial further argued, "Generally speaking, . . . her relationship with each of her kids will form the basis of the jury's understanding of that relationship and of their assessment of that value." The trial court denied Plaintiffs' motion, the judge concluding, as previously noted, "I don't think you can carve one person out of a family, as a matter of law, just because he doesn't want anything and determine that anything about his relationship is completely irrelevant to the evaluation of all of the other relationships that exist in the family."

¶22   Thereafter, during the trial, Allen Memorial elicited testimony from one of the patient's daughters that the son was not living at home at the time of the patient's death, that he might have been incarcerated at the time, and that she herself did not "have that great of a relationship" with the son. And when asked, "Did your mom ever go to see your brother in prison?," she replied, "She never went and visited him in prison, no."

¶23   Plaintiffs contend that evidence of the son's incarceration was irrelevant, that it "was there to pollute the trial," and that "the jury verdict was likely impacted by the inappropriate questions." Noting that "the jury did not find causation," Plaintiffs argue that "[w]hen one family member makes a mistake, not all the family members should have to pay for that mistake, yet that is exactly what happened in this trial."

¶24   The trial court "has broad discretion to admit or exclude evidence." *Avalos v. TL Custom, LLC*, 2014 UT App 156, ¶ 19, 330 P.3d 727. "To obtain relief based on alleged errors in the district court's evidentiary rulings, [Plaintiffs] must shoulder the burden of demonstrating both error by the district court and prejudice, i.e., that there is a reasonable likelihood that a different result would have been reached absent the error." *Anderson v. Larry H. Miller Communications Corp.*, 2015 UT App 134, ¶ 30, 351 P.3d 832 (citations and internal quotation marks omitted).

¶25  Under rule 403 of the Utah Rules of Evidence, "a court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Utah R. Evid. 403. In this case, the trial court did not overtly undertake the customary analysis required under rule 403. And we note that had the court done so, it very likely would have concluded that the limited probative value of the daughter's testimony about the son was substantially outweighed by the danger of undue prejudice. The son was not looking to recover anything from the lawsuit, and it would have been easy enough to address his disclaimer without the daughter's testimony or, better yet, simply make no mention of him in front of the jury.

¶26  Nevertheless, Plaintiffs have not demonstrated any resulting prejudice, i.e., that disallowing the testimony about the son's incarceration was reasonably likely to have led to a more favorable result at trial. *See Covey v. Covey*, 2003 UT App 380, ¶ 21, 80 P.3d 553 ("On appeal, the appellant has the burden of demonstrating an error was prejudicial—that there is a reasonable likelihood that the error affected the outcome of the proceedings.") (citation and internal quotation marks omitted). Although Plaintiffs imply that the jury did not find causation as a result of the daughter's testimony about the son's incarceration and the son's strained relationship with the patient, we are not persuaded. Specifically, we do not believe that a jury would refrain from finding that Allen Memorial caused the patient's death based on information about the son's incarceration and her strained relationship with him. Indeed, as Plaintiffs acknowledge, if anything the information about the son "would have only gone to damages," an issue the jury did not reach given its finding on causation.

¶27  Moreover, Plaintiffs assume that the jury would judge them and the patient harshly because the son was or had been an imprisoned felon. However, even if we accept the accuracy of

Plaintiffs' premise that juries disfavor imprisoned felons, it seems likely that the jurors would just as readily have viewed Plaintiffs and the patient quite favorably. After all, they did the "right" thing, in the view cynically ascribed to the jury, by having nothing to do with the son and apparently having done all they could to distance themselves from him.

¶28 Ultimately, we are not persuaded that absent the few references to the son's incarceration, the jury would have found in Plaintiffs' favor. Consequently, because Plaintiffs have failed to carry their burden of demonstrating that the trial court's alleged error was prejudicial, we conclude that the trial court did not commit reversible error in allowing testimony about the son's incarceration.

CONCLUSION

¶29 The trial court did not err when it denied Plaintiffs' motions for partial summary judgment. In addition, Plaintiffs have not demonstrated that any errors in the trial court's evidentiary rulings were prejudicial. Accordingly, we affirm.

_____